FRANK W. EGAN & COMPANY and
William H. Willert, Plaintiffs,

v.

MODERN PLASTIC MACHINERY
CORP., Defendant.

Civ. A. No. 274–64.

United States District Court
D. New Jersey.

Sept. 28, 1966.

Toner, Crowley, Woelper & Vander-bilt, by John A. Ackerman, Newark, N. J., Fish, Richardson & Neave, by William K. Kerr and David W. Plant, New York City, for plaintiffs.

Harry Sommers, Newark, N. J., by Ernest Montague, New York City, for defendant.

## OPINION

WORTENDYKE, District Judge.

In this action plaintiffs, Frank W. Egan & Company (hereinafter Egan) and William H. Willert (hereinafter Willert) charge the defendant, Modern Plastic Machinery Corp. (hereinafter MPM), with infringement of Claims 1 and 4 of United States Patent No. 2734226 (hereinafter Willert patent), issued to Willert on February 14, 1956, on application filed March 5, 1952. Egan is the exclusive licensee of Willert under the patent. Egan is a New Jersey corporation, and Willert is a citizen of that State. MPM is a Delaware corporation, having its principal place of business in New Jersey, and is charged with infringement of the patent in suit by importing infringing plastics injection molding units and machines built in Germany, and selling and installing them in the United States.

MPM denies both the validity, and infringement, of Claims 1 and 4 of the patent in suit.

Jurisdiction and the appropriateness of venue are conceded, 35 U.S.C. § 283; 28 U.S.C. §§ 1338(a) and 1400(b).

## BACKGROUND OF THE PATENT

A plastics injection molding machine consists of two basic units: the injection

unit, to which the Willert invention relates, and the mold into which the plastic material is injected. The injection unit includes a feed hopper, a plasticizing and injection chamber and appurtenant control and power equipment. Plastics resin in pellet form is introduced through the feed hopper into the plasticizing chamber where it is melted and homogenized, and thence fed into the injection chamber. Subsequently, a quantity of the melted and homogenized resin is forcibly injected from the injection chamber into the mold. After completion of the injection, more plasticized resin is fed to the injection chamber in readiness for the next injection into the mold.

Since the 1930's, builders of plastics injection molding machines have endeavored to design a machine which would produce at a high rate of output a thermally stable melted resin having a uniform temperature and viscosity. However, for many years the sole means employed to attain this goal was the application of heat to the outside of the plasticizing chamber. This means proved inadequate because the resin near the walls of the chamber would be too hot by the time the center of the plastics resin had heated sufficiently. The development of improved resins, and of new resins having properties which made them attractive for various end uses, merely increased the problems of attaining uniform temperature and viscosity. In addition, these new and improved resins were difficult to plasticize and to mold. It became clear that the key to successful molding was the proper plasticization of the resin to be molded, and that such proper plasticization could not be achieved unless improvements were made in the design of the injection cylinder. In 1948, prior to Willert's apparatus, there were approximately 4,000 plastics injection molding machines in operation in the United States. There were 15 domestic manufacturers of such equipment, and manufacturers in England, Germany, Switzerland, and Italy. Against this background, the patent in suit is considered.

*PRIOR ART*

A patent search obtained by Willert's attorney disclosed only U. S. Patent 2,359,839 issued to Goessling on October 10, 1944, on application dated December 21, 1942. This patent, with other prior art patents, was cited by the Patent Office in the patent in suit. Goessling's teaching related to machines for injection molding of plastics and to the mechanism for forcing heat-softened plastic material from an injection cylinder into a mold by means of a ram reciprocable in a cylinder. The principal object of the Goessling invention was to increase the plasticizing speed and capacity of the injection cylinder without lengthening the stroke of the ram, without loss of injection pressure, and without increasing the power required to operate the ram. There are many features of the Goessling machine which are disclosed in that of Willert. For example, a fluid-actuated piston for reciprocating an injection ram or plunger; the piston being actuated by fluid pressure supplied to the cylinder through a port at each of the opposite ends thereof. In Goessling, as in the Willert patent, there is mounted, for rotary movement in the axial bore of the injection cylinder, a shaft continuously rotated. The shaft in Goessling is tubular, while that in the Willert patent is solid. In each of the machines, a granular or powdered molding compound is supplied to the annular space between the shaft and the wall of the bore of the cylinder in which it rotates from a feed hopper above and through an opening in the wall of the cylinder. The forward end of the rotating tubular shaft in Goessling has an external helical screw formed upon its circumference with a snug working fit in the bore of the cylinder. The ram in Goessling, which is reciprocable horizontally, moves within the axial bore of the tubular shaft and is tapered at the end toward the mold to provide continuous communication between the annular space surrounding the screw and the smaller ram-receiving end portions of the bore of the tubular shaft. The injec-

tion cylinder is heated, according to the Goessling specification, preferably by means of one or more electric band heaters which fit around the cylinder between the inlet opening and the discharge nozzle. The Goessling specification describes the operation of his device, in part, as follows:

"Molding material flows from the feed hopper through the inlet opening in the heated injection cylinder into the annular space therein where it is engaged by the continuously rotating feed screw and is forced thereby between the tapered end of the tubular shaft and the tapered intermediate portion of the bore of the cylinder into the reduced outer end portion of said bore. During this forward movement of the molding material, the material is thoroughly mixed and uniformly heated to form a plastic or fluid mass, which fills the reduced forward end portion of the bore of the injection cylinder and the space left in the forward end portion of the bore in the continuously rotating shaft when the ram is retracted. When it is desired to fill the mold, the mold is moved into contact with the outer end of the discharge valve to place the discharge passageway thereof into communication with the entrance or gate of said mold, and fluid is admitted to the rear end of the plunger or ram actuating cylinder to force the ram forward. As the ram moves forward it enters the reduced forward end portion of the bore around the spreader and outwardly through the outlet passageway of the injection nozzle and through the discharge passageway of the valve into the mold. The piston is then moved rearwardly to retract the ram and the mold moves away from the valve permitting * * * [the valve] to close. In accordance with common practice, automatic controls (not shown) are provided so that the mold and ram are operated in proper timed relation and in repeated cycles."

Among the advantages which Goessling alleges are afforded by his device, he cites: increase in quantity of material plasticized in a given length of time without increasing the stroke of the injection ram; possibility of increase in diameter of cylinder without loss of injection pressure and without increase in power required to operate the ram; functioning of helical feed screw as conveyor to move the molding material forward in the injection chamber, exertion of relatively high continuous pressure on the material regardless of the position of the ram; thorough mixing of material and assurance of more uniform heating thereof; and elimination of devices previously employed to supply cylinder with accurately timed and measured charges of molding compound. The obvious principal difference between the Goessling device and that of Willert is found in the fact that Goessling injects the plastic material by means of a plunger reciprocated axially through a tubular rotating screw which feeds the material from the hopper into the injection cylinder, while Willert uses his feed screw as plunger to inject the accumulated plasticized material into the mold. Would it be obvious to a mechanic familiar with the structure and operation of the Goessling device to substitute for Goessling's ram, reciprocating through his tubular feed screw, a reciprocating feed screw serving to inject as well as to feed? For reasons which I shall hereafter indicate, the answer to this question must be in the affirmative. Indeed, at the end of his specification, Goessling anticipates obvious modifications of his machine in the following language:

"Obviously, the hereinbefore described injection molding machine admits of considerable modification without departing from the invention. Therefore, I do not wish to be limited to the precise arrangements shown and described."

Similarly, Willert contemplated variations in the details of his alleged invention by terminating his specification with the following language:

"Whereas for purposes of illustration I have shown and described a preferred embodiment of the apparatus for plas-

ticizing and delivering plastic material of the invention, particularly when it is employed in an injection molding machine, it is to be understood that such embodiment is illustrative only and that the invention is capable of considerable variation as to details."

U. S. Patent 2,402,805 (hereinafter Cousino '805) and 2,471,813 (hereinafter Cousino '813) issued respectively to Cousino on June 25, 1946 and May 31, 1949, relate to improved injection molding apparatus for continuously injecting, under pressure, thermoplastic materials into a mold or through an extrusion die. Claim 2 of Cousino '805 discloses an "apparatus for injecting heat curing plastic compound into a mold having an inlet opening comprising an injecting unit including a discharge nozzle and pressure creating means for forcing plastic compound through said nozzle under pressure, said injecting unit including driving mechanism for said pressure creating means, means shiftably mounting said injecting unit for bringing said nozzle into and out of mold filling engagement with respect to said mold inlet opening, said injecting unit being shiftable under *back pressure applied thereon by said plastic compound when said mold is filled, and a control system for said driving mechanism, including a member responsive to movement of said injecting unit by said back pressure for discontinuing operation of said pressure creating means when said mold is filled."* (Emphasis supplied) The stated objects of Cousino '813 include the provisions of a reversibly driveable pressure-creating mechanism having improved valve means for interrupting the flow of material from the nozzle at the end of a discharge operation, and a shiftable screw member in the pressure-creating unit having an end portion fashioned to serve as a valve for obstructing unintended flow of material from the nozzle, as well as back-flow of material from the mold with which the nozzle is associated in operation. The disclosed device in that patent also provided a resilient means for yieldably urging the shiftable screw toward its valve

closing position, adapted to accommodate shifting of the screw in a reverse, valve opening direction, under the action of the pressure created thereby on the material being injected.

U. S. Patent 2,493,805, issued January 10, 1950 to Dinzl, and cited in the application file of the patent in suit, also disclosed an improvement upon the conventional type of injection molding machine in which a charge of granular molding material is forced through a heated injection cylinder under high pressure by a plunger to plasticize the material and deliver it to a mold where it is maintained under high pressure over a period of time, after which the plunger is retracted and the material in the mold allowed to cool while the plunger remains at rest, and an additional charge of material is fed to the injection cylinder. The specifications of Dinzl state that the plunger is operated hydraulically, and pumping equipment is employed to develop the hydraulic pressure required for its operation. The pumping equipment is actually made use of only during the injection and retraction strokes of the plunger, but operates continuously. Claim 1 of Dinzl's improvement patent describes an injection cylinder having a nozzle at one end, a plunger reciprocable in said injection cylinder, and a reciprocating hydraulic system. The claim defines the reciprocating hydraulic system as "a source of hydraulic fluid under pressure, means for utilizing said hydraulic fluid to force said injection plunger toward the injection cylinder nozzle, means biasing the injection plunger against return movement after completion of the injection stroke, means effective upon completion of the injection stroke of the injection plunger to utilize said hydraulic fluid to effect reciprocation of the filling plunger thereby introducing plasticized molding material into said injection cylinder and causing return of the injection plunger *under pressure exerted by the introduced molding material,* and means effective upon completion of the return of the injection plunger to discontinue reciprocation of said filling

plunger, and lock the same against movement." (Emphasis supplied) A self-closing limit switch is opened by the plunger at the limit of its retraction stroke. A self-opening limit switch and a self-closing limit switch are actuated by the piston of the hydraulic motor. These switches are so arranged that the self-opening switch is closed by the piston at the end of its forward stroke and the self-closing switch is opened by the piston at the end of its retraction stroke.

The plastic molding apparatus described by Willcox in his application filed October 27, 1950 for Patent 2,629,132 (hereinafter Willcox), issued February 24, 1953, received thermoplastic material fed from a hopper, heated the material, and extruded or injected the material into a mold. The specification pointed up, among the disadvantages of prior art devices, the difficulty in attaining temperature control over various parts of the apparatus in order to achieve adequate plasticizing without overheating and burning, and to avoid material buildup in, or clogging of, the injection apparatus. A further difficulty was said to have been encountered in the prior art in effecting an adequate plasticizing of the material and in eliminating trapped air from the molded product. Willcox taught "an apparatus for plasticizing and feeding thermoplastic material comprising a plasticizing head defining an elongated passage, a cylindrical bushing at the forward end of said passage, inlet means for introducing thermoplastic material into said passage near the other end thereof, an elongated member received within said passage, and including an intermediate threaded portion, the forward and rearward ends of said elongated member being unthreaded, with a portion of the unthreaded rearward end extending into said passage adjacent said inlet means * * *, means supporting said member for rotation and reciprocating movement with respect to said head to move said material along said passage under the action of said threaded portion and to eject the material from the forward end of said passage upon

longitudinal movement of said member, * * *."

In addition to the foregoing prior art patents, there was cited by the Patent Office in the Willert application proceedings an Italian patent No. 420839 (hereinafter Italian patent), issued March 9, 1947 to Quillery, disclosing apparatus for the manufacture of molded rubber objects. That apparatus is described in claim 5 of the Italian patent as an injection press for the manufacture of molded rubber objects by introducing, by injection under pressure, a rubber mix into a mold which has been previously closed and maintained at a high vulcanization temperature. The apparatus comprises heating plates making it possible to maintain the mold closed during the injection at a high temperature, and an injection container combined with a piston preferably cooperating with a heating system. The injection piston consists of a rotatable screw within a cylinder, and is "movable parallel to itself so as to force into the mold the mixture which has passed through said screw." The Italian patent, as translated, explains that "[D]uring its introduction, the mix is mixed and subdivided especially by its passage through the plate 23 and then, thus freed of the occluded air, it undergoes an ultra-rapid vulcanization in the mold." The effect of the "mix" upon the longitudinal movement of the "screw" is described as follows: "It will be understood that the rubber mix introduced into the opening 36 is subdivided by the screw 35 and is accumulated, during the period of time between two injections in the lower part of the container 16, which results in the lifting of said screw at the same time as the lifting of the piston 29. At the moment when the chamber 28 is placed under pressure, the mix which has thus been heaped together is in sufficient quantity and the piston 29 moves the screw 35 downward, exerting the same effect as the piston 25 in Fig. 1, namely pushes the said mixture through the plate 23 from where it passes into the conduit 18 and effects the injection, as has been de-

scribed when discussing the first embodiment, of a mix which is freed of occluded air." It should be observed that the screw 35 and piston 29 are disposed vertically in succession above the opening 36 in the Italian patent drawings.

In addition to the prior art cited by the Patent Office, defendant cites a German patent application No. 176425 Xii 39a,[1] dated December 15, 1943, by I. G. Farbenindustrie Aktiengesellschaft, describing an injection molding machine for thermoplastics, consisting of an injection cylinder within the bore of which is a continuously rotating screw which conveys the composition charged through a filling opening in the cylinder wall toward a nozzle at the end of the cylinder into a mold. The injection cylinder is externally heated. The molding composition, after leaving the conveyor screw, passes into a space within the cylinder in front of the screw where it is mixed to equalize temperature differences in the composition, and thence passes into the front portion of the injection cylinder where it collects periodically and whence it can be injected into the mold as required. The injection is effected by bringing the mold against a movable section of the injection cylinder causing that part to slide to the right against a stop and thus forcing the accumulated "shot" of plasticized material to emerge from the nozzle and pass into the mold (much as tooth-paste is forced out of its tube by folding or squeezing the tube). After the completion of the injection, the movable section of the cylinder is forced back, i. e., to the left, into its initial position by the composition which has been conveyed foward in the meantime. In another embodiment of the Beck device, the change in the shot capacity of the injection cylinder is effected by an axial displacement of the rotating screw whose support is made axially movable and is displaced by a sufficient force in the filling direction upon the commencement of the injection process. The rearward movement is effected automatically by the composition which is continuously conveyed into the free cavity of the cylinder.

In an article in Kunststoffe, entitled "Increasing the Capacity of Injection Molding Machines by Preplasticizing", published in Germany in 1951, Beck describes a preplasticizing machine manufactured by Hydraulic Press Manufacturing Co. (HPM) which "uses the [feed] screw directly as *injection plunger* so that * * * the plasticizing screw can be operated continuously * * * [and] makes it possible to color the compound homogeneously at the same time directly in the machine so that the dry coloring method * * * can be dispensed with as an additional operation, and * * * homogeneous colorings can also be obtained." (Emphasis supplied)

The references, upon which MPM relies for support of its contentions that the Willert device did not amount to invention, were disclosed in the prior art. There were six patents and one patent application in the plastics injection molding machine field. There were three other references: the Wiedmann patent and the Tyler patent in regard to hydraulic systems and devices; the Vorraber patent, which disclosed an apparatus for the manufacture of artificial stones and bricks, but introduced by defendant in an attempt to show that it taught elements of the Willert claims. The alleged inventor was chargeable with knowledge thereof. Zero Mfg. Co. v. Mississippi Milk Producers Ass'n, 232 F.Supp. 720, 724 (S.D.Miss.1964) aff'd 358 F.2d 853 (5th Cir. 1966) cert. filed August 4, 1966. The references which relate to plastic molding disclose features of the Willert device which, in combination, perform functions similar to those performed by them in the Willert combination. For convenience in relating the elements of the Willert device to corresponding elements disclosed in the prior art references, MPM has set forth in its post-trial brief, in parallel columns,

---

1. A copy of which, in the collections of the United States Library of Congress, became available to the public on July 11, 1947.

each of the Willert elements and the allegedly corresponding prior art references.[2] This convenient presentation of the features of the claims in suit as compared with the disclosures of the prior art references is as follows:

| WILLERT DEVICE | PRIOR ART DISCLOSURES |
|---|---|
| A plastic material plasticizing and delivering mechanism comprising | |
| (a) a barrel having a passage extending longitudinally therein. | Cousino 2,471,813 (D–9), Goessling (D–13), Vorraber (D–12), Cousino 2,402,805 (D–6), Willcox (D–7), Italian patent (D–5). |
| (b) a rotatable and reciprocable screw for feeding plastic material toward the forward end of the screw. | Cousino 2,471,813 (D–9), Goessling (D–13), Vorraber (D–12), Willcox (D–7), Italian patent (D–5). |
| (c) means for feeding plastic material between the screw and the wall of the passage at a point spaced from the forward end of the screw. | Goessling (D–13), Vorraber (D–12), Willcox (D–7), Italian patent (D–5). |
| (d) means selectively opening and closing the forward end of the passage. | Cousino 2,471,813 (D–9), Vorraber (D–12), Cousino 2,402,805 (D–6), Willcox (D–7). |
| (e) means for rotating the screw. | Cousino 2,471,813 (D–9), Goessling (D–13), Vorraber (D–12), Cousino 2,402,805 (D–6), Willcox (D–7), Italian patent (D–5). |
| (f) means for selectively forcibly but yieldingly opposing reciprocation of the screw in the passage in a rearward direction. | Cousino 2,471,813 (D–9), Goessling (D–13), Tyler (D–10), Wiedmann (D–8), Vorraber (D–12), Willcox (D–7), Italian patent (D–5). |
| (g) and means responsive to a predetermined length of travel of the screw in a rearward direction for positively thrusting the screw in the passage in a forward direction to feed the plasticized material out the forward end of the barrel. | Vorraber (D–12), Dinzl (D–11). |

2. Defendant's Post-Trial Brief, p. 19.

## PATENT IN SUIT

Willert, the inventor named in the patent, had been employed by MPM in 1948 and 1949; performing technical service work consisting of setting up MPM's plastic extruder machines and doing detail work in its engineering department. In April 1950, he became an assistant to the General Manager of Hartig Engine & Machine Co. (Hartig). Hartig was then engaged in the manufacture of extrusion machinery and auxiliary take-off equipment. From that employment, Willert transferred to Egan in August 1952. It was during his employment at Hartig, in March 1952, that the first application for the patent in suit was filed. Willert described the embodiment of his apparatus as "an in-line reciprocating screw plasticizer with adjustable back pressure used for injection molding of thermoplastic materials." He explained that the means for controlling the amount of material plasticized and injected into the mold consisted of "the travel of the screw in a rearward direction that is controlled so that the plastic charge in front of it [the screw] is accumulated, * * * to what you want to shoot in the mold." The idea of a reciprocating screw occurred to him in 1950, in consequence of hearing a lecture on a plasticizing unit at a meeting of the Newark (New Jersey) section of the Society of Plastic Engineers. The unit described in the lecture employed a two-stage plunger system, by which the material was plasticized in the first stage, and accumulated as a charge and forced into the mold in the second stage. That process suggested to Willert that if he could combine the plasticizing action of an extruder with the action of an injection molding machine, he would achieve a superior device for the accomplishment of injection molding. He accordingly consulted patent counsel for whom he prepared, in August 1951, a written description of his idea together with an illustrative schematic drawing. That document, Exhibit P–14, described and illustrated his disclosure of the function and cycle of performance of his extrusion-injection cylinder. The following language is quoted from that exhibit:

"The prepared thermoplastic compound * * * granules, are placed in hopper (1). It falls or is fed to the extrusion screw (2). The material is forced forward in [leftward] direction (A) by the motion of the screw. The screw is turning in a clockwise direction at all times * * * by the torque applied at (3) by an external motor * * *. The cycle begins with the screw in the most forward position direction A or that allowed by the accumulating cylinder or reservoir (4). In this position the reservoir is completely filled by the screw. As the material is conveyed down the extrusion cylinder (5) which is externally heated by electrical heaters (6) (but not limited to this method) it is softened. The amount of softening or plasticization is determined by the degree of heat, rpm of the screw, and pressure. All these factors would be controllable on a production unit. As the plastic moves forward pressure is increased in the reservoir (4) with the cut-off valve (7) closed so as not to allow material to move beyond it. This causes a thrust in [rightward] direction 'B' on the screw. This thrust load is taken up by the bearing and housing assembly (8). Behind this housing is so located a hydraulic or injection cylinder (9). By controlling the pressure on each side of the piston, it is possible to control the load [sic] the screw is allowed to retreat in direction (B). The amount of load will be determined by the pressure needed to produce a solid mass of homogeneous and thoroughly plasticized compound free of air or voids in the reservoir (4). The screw is allowed to retreat a distant [sic] equivalent to produce a reservoir ahead of the screw in volume equal to or slightly greater than that needed for the cavity of the die (not shown). When the above is accomplished and the mold (not shown) is in position the cut-off valve is opened. At the same time,

the screw is forced forward, direction A, by the hydraulic injection cylinder. The now plasticized material collected ahead of the screw is forced forward thru the nozzle (10) and into the die. The construction, movement, cycling, and fitting of the die is the same procedure used on the conventional units. Should the capacity of the reservoir be less than that of the die, the valve could remain open and the screw continue to feed hot material into the mold. When the proper pressure is built up to completely fill the mold, the valve closes and the unit goes thru the same cycle as described above. * * *.''

Willert caused an injection unit to be designed and built in accordance with his ideas, and this device was tested on, or shortly prior to, May 17, 1954. The testimony indicates that the operation of the machine was very encouraging although it failed to mold an acceptable part because of some mechanical difficulty and excessive heat in the extrusion cylinder. During that test, "back pressure" was employed on the device but, for lack of a pressure gauge, the pressure at which the screw was allowed to retreat was a matter of guesswork. The manufacturer of Willert's device, Reed-Prentice Corporation, ultimately lost interest in this machine because of mechanical difficulties encountered. Thereafter, Egan sought, and obtained, an exclusive license under the patent in suit, which had issued in the meantime.

The alleged novel features of the combination described in the claims relied upon were characterized by the plaintiffs at the pretrial conference as " * * * an improvement in an injection molding machine of the type in which a rotating reciprocating screw is used to plasticize and to inject plasticized material. The improvement covered by the claims is found in the specific arrangement in which a charge of molten plastic of a predetermined size is accumulated at the front of the screw and in which the

charge * * * as it accumulates forces the screw backward against an adjustable back pressure. * * * [T]he screw takes pellets of plastic material, plasticizes them, [and] moves them forward to a position in front of the screw [thus] creating a reservoir of molten plastic material at the front end of the barrel in front of the screw[.] [A]s the molten plastic material accumulates at the front of the [reciprocating rotating] screw it forces the screw backwards against an adjustable back pressure. When the screw reaches a predetermined position during its travel backwardly or rearwardly it is then thrust forward to inject the molten plastic material into the mold." [3]

In support of its denial of the validity of the claims of the patent here relied upon, MPM contends that (1) the Commissioner failed to cause a proper examination of the prior art to be made; (2) that Willert was not the original inventor; (3) that the claims relied upon fail to disclose novelty in the light of the prior art; (4) the device described in the claims relied upon would have been obvious to a person skilled in the prior art; (5) plaintiffs are estopped by the application file wrapper; (6) there were false representations made by the inventor to the Patent Office during the prosecution of the application; (7) the alleged inventive features are anticipated in the prior art.

With respect to "controlling back pressure" in the injection unit of the Willert device, plaintiffs contend that "the rotating screw simultaneously plasticizes and moves the resin fed to it from the hopper toward the forward end of the screw" and "by accumulation of the plasticized charge in the barrel in front of the screw causes the screw to move rearwardly. This rearward movement of the screw is opposed by a constant, selected hydraulic force, or 'back pressure'. Selection of a back pressure which is appropriate for the resin being molded produces superior mechanical working of

---

3. See transcript of pretrial conference of April 8, 1965 at pp. 2–3.

the resin and in turn the proper plasticization, homogenization, and degassing of the plastic material."

Plaintiffs concede that Claims 1 and 4, upon which they rely, are practically identical, and disclose "a plastic material plasticizing and delivering mechanism comprising (a) a barrel having a passage extending longitudinally therein; (b) a rotatable and reciprocable screw for feeding plastic material toward the forward end of the screw; (c) means for feeding plastic material between the screw and the wall of the passage at a point spaced from the forward end of the screw; (d) means selectively opening and closing of the forward end of the passage; (e) means for rotating the screw; (f) means for selectively forcibly but yieldingly opposing reciprocation of the screw in the passage in a rearward direction; (g) means responsive to a predetermined length of travel of the screw in a rearward direction for positively thrusting the screw in the passage in a forward direction to feed the plasticized material out the forward end of the barrel." Plaintiffs do not contend that any of the foregoing structural elements of the Willert patent are new. They do assert, however, that "Willert's combination of these old elements produced for the first time an in-line reciprocating screw injection molding unit *in which the size of each successive shot can be simply and accurately controlled, and in which an appropriate pressure for resisting rearward movement of the reciprocating screw can be conveniently selected and fixed.*" (Emphasis supplied) In short, plaintiffs state that "the crux of the Willert invention is this adjustable back pressure which resists the rearward movement of the screw."

As initially filed in the Patent Office on March 5, 1952, Willert's application contained 12 claims, all of which were rejected by the Examiner as unpatentable over the Italian patent, in view of Cousino '805. In his letter of rejection of the application, the Examiner pointed out that the Italian patent "shows a rotatable, reciprocable screw * * *, means for rotating the screw * * *, and means for opposing backward movement to (sic) the screw and for thrusting the screw forward * * *. Cousino shows the use of a valve in an injection nozzle. No invention is seen in mounting a valve such as that shown by Cousino in the injection nozzle of the Italian patent. Any other features which the claims recite, i. e., control mechanism, are held to be *mere matters of design* over the references. The *functional statements* contained in the claims *do not lend patentability to the claims.*" (Emphasis supplied) Responsive to this rejection, the applicant amended his twelve claims as filed, and added thereto a thirteenth claim. Insofar as the claims (1 and 4) presently relied upon by plaintiffs are concerned, each was amended by inserting therein, following the word "selectively", the words "forcibly but" in the phrase "means for selectively yieldingly opposing reciprocation of the screw in the passage in a rearward direction, * * * *". Thus, the phrase, as amended in the claims of the patent as issued, reads "means for selectively forcibly but yieldingly opposing reciprocation of the screw in the passage in a rearward direction." Upon this phrase, as so amended by conjoining the adverbs "forcibly" and "yieldingly" to describe the opposition to the rearward reciprocation of the screw, the asserted validity of the patent in suit depends. The thirteen claims of the application as amended were again rejected by the Examiner in his letter mailed to applicant's attorney on December 15, 1953. After citing, as additional references, Dinzl and Willcox, the letter rejected Willert's claim 1 as unpatentable "over the Italian patent" and rejected claims 2–13 as unpatentable "over the Italian patent in view of Cousino alone or with the addition of Dinzl." The Examiner held, with respect to claim 1, that "the gravitational force opposing reciprocation of the screw of the Italian patent is the equivalent of applicant's 'means for forcibly but yieldingly opposing the reciprocation of the screw.'" Re-

garding claims 2–13, the rejection letter states:

"The Italian patent shows the general structure set forth. No invention is seen in adding a valve such as shown by Cousino to the apparatus of the Italian patent. In regard to control means specified in the claims, it is held that it would not amount to invention to operate the apparatus of the Italian patent automatically. * * * Since the screw is the only moving part of the apparatus of the Italian patent which indicates when the proper amount of material has been charged to the injection chamber, it would be obvious to use movement of the screw to control the automatic operation of the injection ram. This is particularly true since Dinzl discloses the actuation of a switch to actuate a control circuit, which actuation is caused by rearward movement of the injection ram. Therefore no invention is seen in controlling the operation of the apparatus of the Italian patent automatically, the control means being responsive to the rearward movement of the screw."

Upon notification of this second rejection of his application, Willert requested that his claims numbered 1, 3, 4, 7 and 10 be cancelled, and that two claims, numbered 14 and 15, be added to his application. This left claims 2, 5, 6, 8, 9 and 11–15 in the application as of June 11, 1954. Upon further written argument by the attorney for the applicant, these claims were allowed on September 8, 1955, without further comment by the Patent Office. They became claims 1–10 inclusive of the patent, which issued February 14, 1956. In support of his application amendment of June 11, 1954, Willert's attorney contended, in part, as follows:

"The structure of the Italian patent does not include 'means for forcibly but yieldingly opposing reciprocation of the screw.' Quite plainly the force of gravity is not a means; there is no mechanism in the Italian patent which can be interpreted in any warranted manner as responding to such means. The Italian patent does not show any means for selectively opening and closing the delivery end of the passage, nor does it show any means responsive to a predetermined length of retreating motion of the feed screw either to open the path of communication between the mechanism and the mold for postively thrusting the screw in a forward direction to feed the plasticized material out the forward end of the barrel and into the mold, or to effect the combination of such results. It is contended, therefore, that the Italian patent plainly lacks a teaching of the combination set forth in the claims directed to the plasticizing and delivering mechanism, as well as the claims drawn to the injection molding apparatus * * *. It has been found, in the use of applicant's apparatus, that an opposing force far in excess of that which would be exerted by gravity on the movable parts, if the apparatus were disposed vertically, is necessary to produce satisfactory molded objects. Thus, the Italian patent by itself does not supply an answer to applicant's problem· [air bubbles in the plastic material collected in the forward chamber resulting in porosity of the molded article] * * *."

Applicant further argued that a combination of the teachings of the Italian patent with those of Cousino '805, or with those of Cousino '805 and Dinzl, is unwarranted because of lack of a reference showing the basic combination claimed of the differently operating devices disclosed by the respective patents referred to. Thus, from the time of his first amendment of his application, Willert consistently, and with ultimate success in the Patent Office, maintained that the embodiment in a reciprocating, rotatable screw plasticizer of "means for controlling back pressure and controlling the shot size", producing "a properly homogenized and melted [predeterminable] amount of plastic" amounted to invention over the prior art. The defense

of file wrapper estoppel, urged at the pretrial conference, is apparently, and will be treated as, abandoned.

██ The evidence fails to support defendant's contention that Willert made false representations to the Patent Office during the prosecution of, and with respect to, the application. If such contention is predicated upon the conceded error in the description of the operation of certain valves in the hydraulic reciprocation system of the Willert device, I reject the contention in the light of the law and the facts. The operation which was intended, despite the discrepancies in the specifications, was obvious to plaintiffs' expert, Egan, and to defendant's expert, Goldberg, and enabled MPM to construct and demonstrate to the Court an operable machine in accordance with the intended Willert specification. It is sufficient if the claims, read in the light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention. Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 136 (2nd Cir. 1958) cert. denied 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958), cited with approval in Jones Knitting Corp. v. Morgan, 361 F.2d 451, 454 (3rd Cir. 1966).

The essential elements of each of the two claims relied upon are stated in each in identical language, viz.:

" * * * means selectively opening and closing the forward end of the passage, means for rotating the screw, means for selectively forcibly but yieldingly opposing reciprocation of the screw in the passage in a rearward direction, and means responsive to a predetermined length of travel of the screw in a rearward direction for positively thrusting the screw in the passage in a forward direction to feed the plasticized material out the forward end of the barrel."

As MPM correctly points out in its post-trial brief, the Willert device comprises two basic elements, viz.: a barrel having a reciprocating screw whose continuous rotation feeds plastic material into a reservoir and mold, and a hydraulic system by means of which the injection and retraction strokes of the screw are impelled. Both of these features were old in the art, particularly the control means of the hydraulic system, which include the opening and closing of the valve between the reservoir and the mold in operating relationship with the valves which control the reciprocation of the piston in the hydraulic cylinder. Commencing with line 33 in column 4 of the specifications of the patent in suit, we learn that "a shut-off valve 80 is provided in the bore through the nozzle portion, such valve being operated by the hydraulic cylinder 82 *in a conventional manner.* (Emphasis supplied) When the entire unit 16 has been thrust to the left * * *, the forward end of the nozzle sealingly contacts the outer end of the passage 84 in the mold part 12, as diagrammatically indicated in Fig. 2. When this occurs, the mold parts 12 and 14 will have been forcibly clamped together so that plastic material may be injected by the rotating and reciprocating feed screw 36 upon the opening of valve 80 and upon the thrusting of the feed screw toward the mold." It will be noted that the means for clamping the mold parts together are not specifically described or claimed as part of the invention. Such means were old in the art and so recognized in the Goessling patent. In the Goessling application of December 21, 1942, column 2 line 55 of the specification states: *"In accordance with common practice,* automatic controls (not shown) are provided so that the mold and ram are operated in proper timed relation and in repeated cycles." (Emphasis supplied) Willert describes a typical operating cycle of his apparatus as follows:[4] "With the [cut-off] valve 80 opened, the plasticized resin is allowed to emerge from the nozzle * * *. Valve 80, the cylinder 82 of which is controlled by a suitable solenoid operated

---

4. Specifications, column 5, line 47 through column 6, line 31.

██

valve 112, is now closed, thereby stopping the flow of plasticized material from the nozzle. [The granulated plastic compound is flowing through the throat of the hopper and being forced forward in the barrel by the continuously rotating screw.] * * * By the time the thermoplastic material * * * reaches the end of the screw it is thoroughly plasticized, by reason of its continually being worked between the screw and the bore of the barrel and its subjection to heat within the heated barrel. Since such plastic material cannot pass out of the nozzle, valve 80 then being closed, it is deposited ahead of the screw in the space or reservoir 39, thus causing a thrust load upon the screw in a direction to the right. Such thrust load causes the screw 36 to retreat in a direction to the right, thereby leaving an increasingly larger reservoir 39 for the accommodation of the plastic material forwarded by the feed screw. The amount of such accumulation of plasticized material depends upon the mold capacity. The force at which the screw will retreat is controlled by the hydraulic cylinder 56, to which the screw is connected through the medium of carriage 50. Referring to Fig. 4, at the described portion of the operating cycle valve 94 is closed, valve 98 is open, and pressure relief valve 100 is set so that the feed screw retreats under a given thrust load. During the retreating of the screw the oil from the cylinder 56 runs through pipes 90 and 102 back to the tank 88. During this interval of time, the separable mold parts are placed together, the mold being placed in such position relative to the plastic material injecting mechanism as to be filled thereby. When sufficient material has accumulated in the space or reservoir 39 ahead of the end of the feed screw, the carriage 50 will have retreated far enough to operate the limit switch 110 * * *. Thereupon, * * * the valve 94 is automatically opened, the valve 98 is automatically closed, and the piston 58 is subjected to high pressure, whereby to thrust the carriage 50 and the feed screw 36 toward the position at the extreme left. During such time, of course, the feed screw 36 continues to rotate, so that upon the completion of one cycle and the closing of valve 80 the closing of valve 94 and the opening of valve 98 the above described cycle will be repeated."

■■ Patentability requires a showing, in regard to the matter sought to be patented, of novelty, utility, and nonobviousness to a person having ordinary skill in the pertinent art. "The emphasis on nonobviousness is one of inquiry, not quality * * *". Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). In conformity with the dictates of 35 U.S.C. § 103, as enunciated in *Graham*, I am required to examine the scope and content of the prior art; ascertain the differences, if any, between the prior art and the claims at issue; and resolve the level of ordinary skill in the pertinent art. Ibid. In this manner, the question of obviousness must be decided. There is also a question as to the novelty of the patent in suit, but what will be said as to obviousness will be dispositive of this case.

It is pointed out by defendant that the testimony of Willert himself failed to disclose the meaning of the word "forcibly" as used in conjunction with the word "yieldingly" in the critical clause of each of the claims relied upon. Accordingly, says the defendant, if Willert himself does not know what his invention is, and what "forcibly" stands for, the claims in question are hopelessly invalid. Defendant properly states that the public is entitled to know from reading the claims (to which we add the specifications) "where the scope of the protection ends in the Willert invention".

It is obvious to the Court, and I find and conclude, that the rearward reciprocation of the screw results from the pressure created by the progressive accumulation of plasticized material in the reservoir to the left of the screw. That pressure is partially counteracted by

the narrowness of the outlet through which the hydraulic fluid is being forced by the movement of the piston in the cylinder to the right. That counteracting pressure is manually regulated by the setting of the valve 100 controlling the rate of outflow of the hydraulic fluid from the orifice 62 through the valve 98 into the sump 88. The pressure opposing reciprocation is "yielding" by reason of the simple fact that the orifice 62 and the valves 98 and 100 permit the *gradual* exit of the fluid and consequently the *gradual* reciprocation of the screw.

I find as a fact, and it is conceded by the plaintiffs, that each of the structural features of the Willert patent is disclosed in the prior art.

 Willert items designated (a), (b), (c), (d), (e) and (g) above were old in the art.[5] Item (f) refers to unspecified "means" for opposing reciprocation of the screw in a manner characterized by the adverbial phrase "selectively forcibly but yieldingly". This phrase purports to *describe the manner* in which the retreat of the screw takes place. Claims 1 and 4 of the patent in suit do not *explain* this purported description of the manner in which the screw retreats. We will, however, refer to the specifications. Ordinarily, claims should be construed in the light of the specifications and drawings. However, patent claims which do not *define* the invention cannot be aided by reading into them parts of the specifications or of other claims. White Machine Co. v. Bon Ton Cleaners & Dyers, 190 F.Supp. 807, 810 (D.N.J. 1961).

According to the specifications,[6] the plastic material cannot pass out of the nozzle when valve 80 is closed, but is deposited ahead of the screw in the space or reservoir 39. This causes a thrust load upon the screw in a direction to the right. As the screw 36 retreats in that direction it leaves an increasingly

larger reservoir behind [to the left of] it for the accommodation of the plastic material forwarded by the continuously rotating screw. The specification states that the amount of accumulation of plasticized material in the reservoir depends upon the mold capacity. That statement is not accurate. The actual obvious fact is that the amount of accumulation of plasticized material to the left of the screw depends upon the distance through which the screw retreats to the right, and that distance depends upon the position at which the limit switch (110) is manually placed to both limit the rearward movement of the screw carriage and to initiate the injection stroke.[7] As correctly stated in the specification, the limit switch is adjustable longitudinal of the bed along which the screw carriage travels so that the switch will be closed by contact by the carriage " * * * when the latter has traveled a predetermined distance to the right. As a result the volume of the plastic material receiving reservoir 39 may be adjusted so as substantially to equal the volume of the mold employed." The closing of the limit switch operates the solenoid of a valve which hydraulically opens valve 80 which allows the plasticized material in the space or reservoir 39 in advance of the feed screw to flow into the mold. The closing of the limit switch (110) also operates valves in the hydraulic system whereby oil under pressure moves the piston forward and thus thrusts the feed screw to the left which forces the plastic material out of the reservoir and injects it into the mold. The specifications correctly state: "The force at which the screw will retreat is controlled by the hydraulic cylinder 56, to which the screw is connected through the medium of carriage 50." That force is limited by setting a pressure relief valve (100) to a given thrust load for the retreat of the feed screw. Nowhere else in the Willert specifications or

---

5. Even if it is conceded, as plaintiffs contend, that the Vorraber patent teaches nothing which would affect the validity of the Willert patent, this would not minimize what I say hereinafter.

6. Column 5, line 62 et seq.

7. See Specifications, column 5, lines 1–8.

claims is to be found an explanation of the phrase "means for selectively forcibly but yieldingly opposing the reciprocation of the screw in the passage in the rearward direction." It appears obvious to the Court that, in the operation of the Willert device, the limit switch is set at a point in the rearward path of travel of the screw carriage so as to equalize the volume of the reservoir space to the left of the screw with the estimated capacity of the mold. Thus, when the plasticized material in the reservoir substantially equals the capacity of the mold, the rearward travel of the screw ceases upon the tripping of the limit switch, and the screw, with its carriage and motor, is hydraulically forced to the left, thereby serving as a plunger to inject the accumulated quantity of plasticized material into the mold. It is therefore by means of the functioning of the hydraulic system, actuated by the pressure of the accumulation of material in the reservoir, and the respective settings of the limit switch and of the pressure relief valve, that the reciprocation of the screw is opposed selectively forcibly but yieldingly. The operation is induced selectively by the settings at which the limit switch 110 and pressure relief valve 100 are manually adjusted. The accumulation of the plasticized material in the reservoir forcibly impels the retreat of the screw, and the ratio between cross-section of the outlet 62 in the cylinder head to the volume of the hydraulic fluid between it and the piston head serves as the yielding cushion against which the piston head retreats.

 Plaintiffs seek to overcome defendant's plea of obviousness under Section 103 by asserting that the prior art failed to teach or to suggest the use in an injection molding machine of "adjustable back pressure", a feature which allegedly adds so conspicuously to the performance of the Willert machine.[8] Nevertheless, in a footnote on the same page, plaintiffs state: "The structure for applying an adjustable back pressure

to a reciprocating screw was then [1950 and 1951] available (e. g., Wiedmann (D–8), Fig. 1, valve 10 and associated hydraulic circuitry) to any plastics injection molding machine designer who wanted to incorporate that feature in his machine." Wiedmann's hydraulic transmission patent, therefore, was a structural element old in the art and, as such, is a proper reference for determining obviousness of the claims in suit. See Gould-National Batteries, Inc. v. Gulton Industries, Inc., 361 F.2d 912, 914 (3rd Cir. 1966). Section 103 of the Act expressly contemplates that the "subject matter sought to be patented and the prior art may differ" and yet render obvious the subject matter as a whole. Further, an invention may be new in the sense that nothing like it has previously existed, but if the difference between the new thing and that which was known before is not sufficiently great, requiring only the application of mechanical skill, then there may yet not be patentability. Skee-Trainer, Inc. v. Garelick Mfg. Co., 361 F.2d 895, 899 (8th Cir. 1966). Willert claims novelty in the embodiment "in a reciprocating, rotatable screw plasticizer" of "means for controlling back pressure and controlling the shot size.". He provides an appropriately-sized charge of plastics material in front of the rotating screw by regulating the length of rearward travel of the screw by manual adjustment of the tripping switch, limiting the retreat of the carriage bearing the screw and its power sources. Such a combination does not rise to the level of patentability. The opposition of the rearward movement of the screw by a constant, selected hydraulic force, or "back pressure", appropriate for the resin being molded, by means of the manual adjustment of the pressure relief valve in the appurtenant hydraulic circuitry of the Willert device would be a necessary physical consequence of the functioning of the elements of the combination, and the result of mechanical skill rather than inventiveness. Wiedmann's U. S. Patent

8. Plaintiffs' brief, p. 43.

2,397,395, issued March 26, 1946, disclosed hydraulic transmission having means to impose a back pressure upon the motor thereof and means to remove or reduce the back pressure in response to a predetermined increase in the motor load. It claimed, in part, ".a hydraulic transmission having a hydraulic motor, a pump for delivering motive liquid to said motor to energize the same and a resistance normally effective to resist the discharge of liquid from said motor to thereby impose a back pressure upon said motor * * *." Willert's "back pressure" is created and regulated by the hydraulic system appurtenant to, but not claimed as an element of, his invention. The teaching of Wiedmann forms part of the prior art relevant to the issue of obviousness. Skee-Trainer, Inc. v. Garelick Mfg. Co., supra at 898, where the Court stated: " * * * 'prior art' may include not only earlier devices and publications but also similar devices whether or not in related areas to the patented device and with respect to a simple mechanical device utilizing universally known principles permits referring to the field of mechanics itself."

■ The "means for selectively forcibly but yieldingly opposing reciprocation of the screw in the passage in a rearward direction" and the "means responsive to a predetermined length of travel of the screw in a rearward direction for positively thrusting the screw in the passage in a forward direction to feed the plasticized material out of the forward end of the barrel", referred to in Claims 1 and 4 of the patent in suit, do not constitute patentable invention, and the description of their functioning was obvious in the light of the prior art to which the device described in the patent belongs. "It has been recognized since Knapp v. Morss, 150 U.S. 221, 14 S.Ct. 81, 37 L.Ed. 1059, decided in 1893, that patentable invention consists in the embodiment of *new and useful means* to achieve a desired result and not in the *functions attributed to* the means." (Emphasis supplied) General Radio Company v. Superior Electric Company,

321 F.2d 857, 862 (3rd Cir. 1963) cert. denied 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964) reh. denied 376 U.S. 973, 84 S.Ct. 1134, 12 L.Ed.2d 88 (1964).

We need not consider the effect of such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., in this case. As was brought out upon the direct examination of Willert by defense counsel, it is obvious that the so-called Egan Machine with the trademark Reciproscrew is not the embodiment of the Willert patent under which it has an exclusive license. What was said by the Court in Photon, Inc. v. Harris-Intertype Corp., 235 F. Supp. 921, 927 (D.Mass.1964) aff'd per curiam 349 F.2d 856 (1st Cir. 1965) cert. denied sub nom. Tansel v. Photon, Inc., 382 U.S. 1011, 86 S.Ct. 621, 15 L.Ed.2d 527 (1966) is equally applicable here, and I quote: "It is significant to note that plaintiff * * * did not come into court and offer evidence of having previously marketed a machine based on the * * * [Willert patent] which has enjoyed any commercial success whatsoever and which * * * [plaintiff] claims defendant has pirated." (Insertions mine) The Egan machine does *not* have means for selectively opening and closing the forward end of the passage, has *no* limit switch, but does have *a time delay in conjunction with a limit switch which is supplied, upon conversion of the machine, by customers themselves.* The Willert patent *does not* teach a time delay. There is nothing in the Willert patent which provides for *stopping* the operation of the cycle. The Willert patent teaches that the reciprocating screw rotates *continuously.* In addition, the Egan machine utilizes an electrical drive whereas the Willert machine utilizes an hydraulic drive. The testimony indicates that the Egan machine more closely resembles the in-line reciprocating screw plasticizers manufactured by the Ankerwerk Company of Germany. At page 1122 of the trial transcript, Willert was asked: "Would you please explain to the Court the differences or similarities, whatever may be, between the

Ankerwerk machine and the Egan machine?" Willert answered, at page 1124: "Well, the operation of the Ankerwerk and the Egan machine, as our customers use them, is for all practical purposes identical." Despite this, Egan sought protection for the machine, which it manufactured, by selling it under the Willert patent.

Finding that the patent in suit is invalid, I do not reach the issue of infringement since an invalid patent cannot be infringed.

The foregoing constitutes the Court's findings of fact and conclusions of law, in compliance with F.R.Civ.P. 52(a). Present an appropriate order.