**FRANK W. EGAN & COMPANY and William H. Willert, Appellants,**

v.

**MODERN PLASTIC MACHINERY CORP.**

No. 16446.

United States Court of Appeals Third Circuit.

Argued June 9, 1967.

Decided Dec. 29, 1967.

Rehearing Denied Feb. 1, 1968.

William K. Kerr, Fish, Richardson & Neave, New York City (Marshall Crowley, Willard G. Woelper, Toner, Crowley, Woelper & Vanderbilt, Newark, N. J., David W. Plant, Fish, Richardson & Neave, New York City, on the brief), for appellants.

Ernest G. Montague, New York City (Harry Sommers, Newark, N. J., on the brief), for appellee.

Before STALEY, Chief Judge, KALODNER, Circuit Judge, and SHERIDAN, District Judge.

KALODNER, Circuit Judge.

OPINION OF THE COURT

Did the District Court correctly apply the controlling legal test of "obviousness" of Section 103 of the Patent Act of 1952, 35 U.S.C.A.,[1] in holding,[2] in the instant patent infringement action, that Claims 1 and 4 of Patent No. 2,734,226 were invalid for lack of invention and obviousness in the light of the prior art?

The mooted patent for an "Injection Molding Apparatus" was issued to the plaintiff William H. Willert on February 14, 1956. The patent relates to a plastics injection molding machine for plasticizing and delivering to a mold plastics materials at high speed and under high pressure, and under critically controlled conditions. The plaintiff, Frank W. Egan & Company, is the exclusive licensee of the patent. The Defendant, Modern

---

1. Section 103 provides as follows:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. July 19, 1952, c. 950, § 1, 66 Stat. 798."

2. The District Court's opinion is reported at 260 F.Supp. 22 (D.N.J.1966).

Plastic Machinery Corp. is charged with infringement of the patent by selling and installing in the United States infringing plastics injection molding units and machines built in Germany.

The District Court did not decide the issue of infringement. It did, however, enjoin the plaintiffs from threatening infringement or instituting actions for infringement against the defendant or its privies.

It is undisputed that Willert's patent is a "combination" patent; viz., a combination of old structural elements. Plaintiffs urge, however, that Willert's new combination of old structural elements, subsequently discussed, "has all the traditional hallmarks of patentable invention". The defendant, in reply, contends that the District Court did not err in its holding of "obviousness"; further, that Willert's patent did not contribute to the molding art.

What has been said brings us to resolution of the question as to whether the differences between Claims 1 and 4 of the Willert patent and the pertinent prior art would have been obvious to a person having ordinary skill in the art. 35 U.S.C.A. § 103; Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). The latter cases are a guiding beacon and we sought to follow its course in Schmidinger v. Welsh, 383 F.2d 455 (3 Cir., 1967) and Jones Knitting Corporation v. Morgan, 361 F.2d 451 (3 Cir., 1966).

■ Applying the teachings of the *Graham* and *Adams* cases, we have reached the conclusion that the claimed invention was not "obvious" within the statutory meaning, and we must accordingly reverse the judgment of the District Court. Regrettably, the District Court did not follow the preferred procedure of deciding the issue of infringement; consequently, the cause must be remanded for further proceedings.

A plastics injection molding machine consists of two basic units: the injection unit, to which the Willert invention relates, and the mold. The injection unit includes, generally, a feed hopper, a plasticizing chamber, an injection chamber (which may be, and often is, the plasticizing chamber, as well) and various controls and power equipment. Plastics resin, or resins, in pellet or powder form, are introduced through the feed hopper into the plasticizing chamber of the injection unit. The pellets or powder are melted and homogenized in the plasticizing chamber. Subsequently, a quantity of the melted and homogenized resin is forcibly injected into the mold.

The mold is designed to produce a part, or a number of parts, of desired shape and size, e. g., cups, plates, bottle caps, etc. After injection, the mold is held in closed position to allow the injected resin to cool. The mold is next opened, the molded article removed and the mold closed. The injection cycle and the mold cycle are then repeated.

The industrial problem centers about the production at a high rate of output of a thermally stable melted resin having a uniform temperature and viscosity. The conventional means employed was to heat the outside of the plasticizing chamber, a method which did not satisfactorily cope with the fact that plastics resins are notably poor heat conductors. Overheating causes decomposition of the resin. Application of heat to the exterior walls of the plasticizing chamber frequently resulted in overheating or burning the resin nearer the wall by the time the center of the resin was sufficiently heated. Frequently, there was an uneven distribution of heat, and the mixture was not homogeneous. The problems of achieving uniform temperature and viscosity were increased by the development of improved resins and of new resins having properties which made them attractive for various end uses, but which were difficult to plasticize and to mold.

The key to successful molding is proper plasticization. It was believed that this could not be obtained without improvement in the design of the injection cylinder. Actually, the problem was related to heat application and its control

as applied to the injection cylinder. It does not appear that, prior to Willert, designs of the injection cylinder were more than partially successful.

The inventor recites in detail recognition of the technical difficulties centering around the problem of designing a machine to deliver a consistent mass of thoroughly homogenized plastic material at a uniform rate and temperature under pressure to a mold.

Claims 1 and 4 of the Willert patent, except for the preamble to Claim 4, are identical.[3] They define Willert's improved combination, and set forth the essential elements of the invention. Divided into its various components, and omitting reference numerals from the patent drawings, the invention is set forth by the plaintiffs as follows:

"A plastic material plasticizing and delivering mechanism comprising

(a) "a barrel having a passage extending longitudinally therein,

(b) "a rotatable and reciprocal screw for feeding plastic material toward the forward end of the screw,

(c) "means for feeding plastic material between the screw and the wall of the passage at a point spaced from the forward end of the screw,

(d) "means selectively opening and closing the forward end of the passage,

(e) "means for rotating the screw,

(f) "means for selectively forcibly but yieldingly opposing reciprocation of the screw in the passage in a rearward direction,

(g) "and means responsive to a predetermined length of travel of the screw in a rearward direction for positively thrusting the screw in the passage in a forward direction to feed the plasticized material out the forward end of the barrel."

The inventor claims that his apparatus produces a homogeneous mass of plastic compound free of volatile matter, air, or other condensable substances, in an optimum plasticized state to be injected into either a mold or transfer cylinder. He sets forth that the resulting molded article is characterized by its uniformity, freedom from strain, and the faithfulness which it follows even the finest and most intricate details of the mold cavity. He says that his invention provides a mechanism in which the plastic material is thoroughly mixed and plasticized, as well as brought to a uniform desired temperature before injection into the mold, whereby lower injection and mold clamping pressures are possible than heretofore, and also whereby the plastic material is subject to shorter total heating cycle than was otherwise possible.

In operation, the pellet or powder resin is fed through a hopper into the plasticizing and delivering barrel in which an in-line screw is positioned for rotating and reciprocating movement. Not only does the screw reciprocate forwardly and rearwardly, within the barrel, but the entire injection unit may be moved toward or away from the mold supporting structure. By the time the thermoplastic material reaches the end of the screw, it is thoroughly plasticized, by reason of its continually being worked between the screw and the bore of the barrel and its subjection to heat within the barrel. Since the material cannot pass out of the forward end (nozzle) during this

---

3. Claim 1, as set forth in the patent issued, reads as follows:

"1. A plastic material plasticizing and delivering mechanism comprising a barrel having a passage extending longitudinally therein, a rotatable and reciprocable screw for feeding plastic material toward the forward end of the screw, means for feeding plastic material between the screw and the wall of the passage at a point spaced from the forward end of the screw, means selectively opening and closing the forward end of the passage, means for rotating the screw, means for selectively forcibly but yieldingly opposing reciprocation of the screw in a rearward direction, and means responsive to a predetermined length of travel of the screw in a rearward direction for positively thrusting the screw in the passage in a forward direction to feed the plasticized material out the forward end of the barrel."

process, it is deposited in the barrel ahead of the screw, thus causing a rearward thrust upon the screw and forcing it to retreat, thereby increasing the accommodation for the material forwarded by the feed screw, as it rotates. The amount of such accumulation of plasticized material relates to the capacity of the mold into which it is to be injected. The force at which the screw will retreat is selectively controlled by a hydraulic cylinder to which the screw is connected through the medium of a carriage. A pressure relief valve is set so that the feed screw retreats under a given thrust load. A limit switch is provided on the bed of the injection unit, so that when the latter has traveled a predetermined distance rearward the retreat will be stopped. As a result the volume of plastic material received in the barrel forward of the screw may be adjusted so as to substantially equal the volume of the mold employed. This, in effect, controls the "shot size". As a result of the closing and opening of the various solenoid operated valves, the screw is then hydraulically thrust forward to bring about the injection of the plastic compound through the now-opened nozzle at the forward end of the barrel and into the mold employed.

The adjustable "back pressure" is element (f) and the shot size control feature is element (g) above. These are the essence of Willert's claimed invention.

It is the concept of the inventor that the controlled back pressure creates optimum mixing and plasticizing for a given material. As we understand it, it is his claim that controlled back pressure is essential. Because they vary in such properties as viscosity and heat sensitivity, different plastics materials require different amounts of mechanical working to reach a proper state of plasticization. The amount of working depends primarily upon the magnitude of internal forces generated in the material as it moves along the rotating screw. This sheer stress is increased or decreased by varying the amount of back pressure. Back pressure creates internal heat in the mixture, thereby increasing uniformity of heat dispersal and enabling a lower degree of external heat. The degree of mixing required to create a properly homogenized "charge" depends upon, and is controlled by, the amount of back pressure. In addition, the use of an appropriately selected back pressure results in properly degassing the plastics material as it is moved forwardly in the barrel through the travels of the rotating screw. The shot control, of course, eliminates the problems attendant upon inadequacy of the "charge" to complete the mold, or overabundance of the "charge", which may result in lack of homogeneity of the next "charge".

The evidence, in our opinion, amply supports the commercial success of the apparatus in the industry, and the long-felt, unsatisfied need previously existing.

### The Prior Art And Validity

The District Court concluded that the claimed invention, in the light of the prior art, would have been obvious to a person skilled in the art. Relied upon are eight references in the plastics injection molding machine field: Italian patent 420,839; Goessling patent 2,359,-839; German patent application 176,425; Cousino patents 2,402,805 and 2,471,813; Dinzl patent 2,493,805; · Willcox patent 2,629,132 and a 1951 article by Beck. All of these were recited by the Patent Office, except the German application. In addition, the District Court relied upon the Wiedmann patent 2,397,395, relating to a hydraulic transmission system; the Tyler patent 2,492,720 for a hydraulic drive and speed control, and the German Vorraber patent 180,007 which disclosed an apparatus for the manufacture of artificial stones and brick.

We do not stop to detail the content of these citations, for they are fully set out in the reported decision of the District Court. We have no doubt that elements of the claimed invention (a) through (e), as set out above, were disclosed prior to Willert. The file wrapper clearly shows the issue before the Patent Office was reduced to elements (f) and (g), and whether these elements were either a

part of the prior art or at least obvious to a person skilled in the prior art. Indeed, the file wrapper specifically shows the citation of the Dinzl patent as disclosing a limit switch to control the length of travel of the plunger.

In view of the file wrapper history, we think the Patent Office conclusion is entitled to weight, and its determination in issuing the patent enables the plaintiffs to start with the presumption of validity. However, the file wrapper would indicate a narrow construction of the patent.

As stated in Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263 (2 Cir. 1967):

> "Whether or not it [the patent] is to be classified as a combination patent or an improvement patent or both is in this case largely a matter of semantics. As Judge Learned Hand phrased it in B. G. Corp. v. Walter Kidde & Co., 79 F.2d 20 (2 Cir. 1935): 'All machines are made up of the same elements * * * But the elements are capable of an infinity of permutations, and the selection of that group which proves serviceable to a given need may require a high degree of originality. It is that act of selection which is the invention.'" 372 F.2d at 268.

The plaintiffs here do not deny that the elements of the apparatus involved are old. Their concession includes the hydraulic system, as to which, in a different context, Weidmann shows a form of "back pressure". But the use in a remote cited art certainly suggests it to be less likely that a person of ordinary skill in the pertinent art would have arrived at the result achieved by the patent in suit. Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., supra; Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F.2d 536 (2 Cir. 1966); Ric-Wil Co. v. E. B. Kaiser Co., 179 F.2d 401 (7 Cir.

1950). In any event, the mere fact that the elements are concededly old does not itself militate against patentability, as the District Court seems to suggest.

Here, in our view, Willert employs a method of achieving the result needed by the industry conceptually different from that disclosed by the prior art, and indeed, uses the hydraulic "back pressure" in a manner neither indicated by the prior art nor obvious to a person skilled in the art, at least on the record of this case. We do not think that the reference to "back pressure" in the Cousino patent 2,402,805, may be read as bearing on the invention in suit. And while back pressure may have resulted with respect to the retreat of the hydraulic fluid in the Italian patent, adjustable back pressure was not mentioned, and the resultant back pressure was inconsequential and not conceptually related to the invention. It remained for Willert to recognize that adjustable back pressure, of sufficient magnitude, created through the use of hydraulic force opposing the retreat of the screw, resulted in eliminating substantial problems of the industry. It is the back pressure which causes more internal heat to be generated, obtaining greater uniformity of heat and its distribution, so essential to the proper plasticization and homogenization of the plastics material; speeds up the process, and reduces the likelihood of air bubbles and similar disruptive occurrences. Notwithstanding the protestations of the defendant, the record adequately demonstrates that its own experts hailed the precise point of Willert's invention, the importance of the concept and its significance.[4]

In summary, we conclude that the Willert invention is novel, has utility and not obvious to one having ordinary skill in the art to which its subject matter pertains, and that it represents a

---

4. The defendant's executive vice-president, Leslie J. Kovach, in a paper which he presented to the American Society of Mechanical Engineers, evaluated the "in-line reciprocating screw" of the Willert patent as a "great advance in the processing and economy of plastic materials", and the adjustable back pressure functioning of the reciprocating screw as "the real break-through in this new plasticizing concept". The paper, incidentally, was presented in late 1964, after the instant suit was commenced.

significant advance in the field. In doing so we have given measured weight to the "secondary considerations" of "commercial success, long felt but unsolved needs, [and] failure of others" to achieve the result acknowledged as relevant indicia, in Graham v. John Deere Co., supra, and in United States v. Adams, supra. See Jones Knitting Corporation v. Morgan, supra, 361 F.2d at page 458.

For the reasons stated, the Judgment of the District Court will be reversed, and the cause remanded with directions to proceed in accordance with this Opinion.