Emory W. **WORTHINGTON**, Plaintiff,

v.

**SOUTHERN NEW JERSEY NEWS-PAPERS, INC.**, Defendant.

**Civ. No. 1146-64.**

United States District Court,
D. New Jersey.

May 13, 1970.

As Amended May 18, 1970.

444

Samuelson & Jacob, Hackensack, N. J., for plaintiff; by Arthur Jacob, Cyrus D. Samuelson, George A. Beckmann, Hackensack, N. J., of counsel.

Pitney, Hardin & Kipp, Newark, N. J., for defendant; William P. Reiss, John W. Bissell, Wolfe, Hubbard, Voight & Osann, Newark, N. J., by Phillip Mayer, Chicago, Ill., of counsel.

## OPINION

SHAW, District Judge.

This action arises out of an alleged patent infringement. The Court has jurisdiction by virtue of 35 U.S.C. 271, 281 and 28 U.S.C. 1338(a), 1400(b).

Plaintiff, Emory W. Wortington, is the inventor and owner of the patent involved in this litigation. The patent is United States Patent No. 2,869,460 (460 patent). The application for the patent was filed on February 27, 1957, and the patent was issued on January 20, 1959. Plaintiff alleges infringement by defendant. Plaintiff is a citizen of the State of New Jersey and defendant Southern New Jersey Newspapers, Inc. (Southern), is a New Jersey corporation in the business of publishing a daily newspaper known as the Courier-Post of Camden. Southern has its principal place of business at Cherry Hill, New Jersey.

The patented device is described as a '"rotary letter press ink fountain" designed for use in highspeed rotary newspaper printing presses. Southern uses "Goss Mark II" printing press units. Plaintiff contends that the use thereof by Southern in its newspaper business infringes the 460 patent. The press units are manufactured by the Goss Company of Chicago, Ill. The Goss Company (Goss) is a division of Miehle-Goss-Dexter, Inc. Goss is not a party to this litigation but it has been an active participant in the litigation on behalf of Southern. It has agreed to hold defendant Southern harmless in case of judgment against it, and it has assumed responsibility for all expense that may be incurred by Southern, including payment of counsel fees.

Plaintiff seeks injunctive relief, an award of damages for infringement, and assessment of costs. Plaintiff also seeks an adjudication by the Court that Goss is the real party defendant in interest in this litigation.

■ There is no doubt that Miehle-Goss-Dexter, Inc., though not a named defendant, is a real party in interest in this litigation, actively participating in the conduct of the defense. In fact, the record discloses that Southern has nothing at stake except loss of a continued right to use the accused device which it purchased from Goss. Goss is the manufacturer and it has undertaken by agreement to hold Southern harmless from any loss it might sustain as a result of the purchase and use of a Goss printing unit. Goss has undertaken by active participation in this litigation to perform its obligation to Southern. The Court finds that there is privity which would make any judgment herein binding upon Miehle-Goss-Dexter, Inc., under the principle of judgment by estoppel.

## PRINTING PRESSES

A modern highspeed newspaper press is a rotary press in which newspaper pages are printed upon a continuous "web" of paper supplied to the publisher in large rolls. A press is composed of a number of printing units arranged so that the press level is above the room having the rolls of paper on highspeed machines at high tension continuously feeding webs of paper to the press units above and thence to a "folder", which collates the individual webs and cuts and folds the paper to produce the finished product which we know as a conventional newspaper.

The pages of a newspaper are printed by passing the web of paper between a plate cylinder containing the raised type of the page to be printed and a compression cylinder, which bears against the plate cylinder, pressing the paper against it. The web then proceeds to another plate cylinder and compression cylinder couple which prints on the opposite side of the paper. These two printing couples make up one press unit. It is customary that a press unit is several pages wide,

as is the web of paper that feeds into it so that one press unit will print a number of newspaper pages. The webs pass to a transfer mechanism which carries them to a folder unit. The Goss Mark II press at defendant Southern's printing plant consists of nine full printing units plus a "half-deck" unit.

In order to print a newspaper, the raised type of the plate cylinder must be coated with a film of ink. The mechanism which regulates the quantity and quality of ink supplied from bulk quantity to the plate cylinder is the patented devise. Mr. William F. Davis, a consulting engineer in the graphic arts industry, testified about the development and operation of such inking arrangements for printing presses:

A. Well, I guess I would like to start by going back to the very early printing where we had a printing plate that was—let me illustrate it as a letterpress plate with high spots which are the raised portions of the type that will have the ink.

Initially type such as this were inked by a man taking ink and putting it on a plate on the side, rolling this out on a roller, so you have a thin film. This thin film was split between the plate and the roller and when it was smooth enough on visual inspection, and properly attenuated it was rolled across the type face so you deposited ink on the raised characters. Then you took a piece of paper and placed the paper over the type and applied pressure to that. That transferred the ink to the paper, and you raised the platen. It was a process that went sheet by sheet, inking individually for each sheet.

As the need for higher production became necessary the platen, the separate roll, was replaced by a system where the type face was left on one platen and a series of rollers were mounted on a carriage. This series of rollers had the ink placed in the rollers so that then as the rollers rotated it attenuated the ink and spread it. Then the entire series of rollers was passed over the type face, inking the raised portions of the type. The previous action was again repeated, of putting the paper on top and then applying pressure to it, taking an image.

Again, with this method, the uniformity of the ink being spread could be seen on the rollers and seen on the type bars.

When the industry progressed to the point where they wanted a still higher production and ease of operation they added a fountain roll to the side which this carriage and return pad contacts, taking some ink off. This fountain roll was in the body of ink, so when it came over it would take some ink off. Eventually that was improved by putting a duct roll that went to the fountain roll and ink carrier. That is called ink motion. A blade was positioned near the upper portion of the fountain roll and provided with a series of screws. These screws were made so they could adjust the position of the tip of that blade to the roller. As this roll rotated slowly * * * it carried the film of ink with the roll, and it reached the duct blade or regulating knife. That knife restricted the passage of the full thickness of ink, rejecting some of it and letting the rest pass through the top surface where it was taken by the transfer duct roll and fed to the ink motion.

After the ink was properly distributed and attenuated it contacted the ink motion.

As need for still higher production became apparent the method of printing was replaced by a rotary system which compressed a plate which carried the plate and impression cylinder. * * * Paper passed around the impression cylinders. Now in this case the plates were provided with an ink train or ink motion. This ink train again had a duct rotation * * * and a fountain with a regulating duct or blade and a drawer containing ink.

A modern newspaper press such as the Goss Mark II operates at a very high

speed, the top printing rate being about 70,000 newspapers per hour. At such speeds, visual inspection of the ink film applied to the type face is obviously an impossibility, so a mechanical means of applying the necessary thin uniform film of ink consistently and dependably had to be developed. This method is described by Mr. Davis. A press unit is constructed in the form of an arch—an inverted U-shape. The compression and plate cylinder couples are located at shoulder height on each leg of the arch and in operation print each side of the newspaper. Ink fountains are located at each foot of the arch on floor level. In each ink fountain a fountain roller revolves in a body of ink, having a surface designed to pick up ink on it as it rotates. A "fountain blade" or "doctor blade" is spaced at a regulable distance across the length of the fountain roller. This blade shears off all of the ink except that which can pass through the space between the blade and the roller surface. Another roller called a "pickup roller" is spaced at a certain distance from the fountain roller at a location past the fountain blade, and as this pickup roller rotates, it interferes with the film of ink left on the fountain roller, splitting the film and taking some of it upon its surface. This is known as the "continuous feed" process used on Goss presses. An alternative method used on other presses consists of a ductor roller oscillating between the fountain roller and the ink motion (a series of rollers). Whichever method is used the pickup roller or ductor roller then transfers the ink film to a series of rollers situated in the legs of the arch which split and work the ink into the necessary thin film that is finally applied to the type on the plate cylinder which transfers an impression onto the rapidly moving web of paper.

The only portion of the inking mechanism that is at issue in this suit is the ink fountain—the device which takes ink from a bulk source and places a regulable amount on the surface of the fountain roller.

## THE PATENT IN SUIT

United States Letters Patent No. 2,-869,460 was issued to Emory W. Worthington on January 20, 1959 (PX 1). It has been stipulated that Worthington is the sole owner of the 460 patent.

The invention relates to an alleged "novel and improved rotary ink fountain especially adapted for use with high-speed rotary letterpress printing presses of the type used in the printing of newspapers." (PX 1). The patent specifies:

> The present invention has for its object the provision of a novel and improved rotary letterpress ink fountain especially adapted for the supply of link [sic] to the rotary printing member of a high speed rotary newspaper printing press. A further object is the provision of an ink fountain of the general kind referred to, which is provided with means for continuously recirculating the body of ink to and from a substantially enclosed fountain roller, for continuously supplying an excess of ink to the fountain roller for cleaning the surface of the fountain roller at each revolution thereof, and for removing the larger particles of dirt and trash from the ink within the fountain housing while the remainder of the excess ink is returned to be recirculated in the ink system. Still another object of the invention is the provision of a novel and improved ink fountain which produces a more reliable inking system which is less likely to produce non-uniform inking as it operates over extended periods of time, than ink fountains heretofore used. A further object is the provision of an improved ink fountain which is relatively simple in its construction and is unusually reliable, precise and uniform in its operation whereby an improved quality of printing results from its use. (PX 1, p. 1)

The chief specific object of the patent is the ability of the fountain to remove dirt and foreign particles from the ink in the fountain and fountain roller, and to prevent these contaminants from inter-

fering with the fountain blade. The value of such a device was described by Mr. Davis:

> The paper, lint, foreign, loose materials that may have been on the paper was picked up by the ink on the printing plate and carried back down through the ink train. Every time you would have an ink split between two rollers some of the ink that was on the roller—ink on whichever roller it happens to be is split between the two rollers, so ink is transferred up through the rollers, but also ink or whatever foreign material may enter at the top is transferred down through the arch. This foreign material is transferred down through the duct roll which transfers it in turn to the fountain and it contaminates the ink supply.
>
> The ink supply as a result of this carried this foreign material up under the regulating blade. That blade. * * * It has a small gap between it and the roller, and this foreign material would gradually accumulate and lodge under the blade. As it lodged on the blade it would force that blade into a raised position. Now, two things happened, and at this time, the closing of this gap reduced the amount of ink that was transferred to the duct roll up through the train, so the tone of the ink that was printed, instead of being heavy black became a light gray. In addition to that, if we look at that blade in the other view—it is a long blade—and it has regulating screws dispersed along its length. * * * As dirt lodged on the plate—points such as say the center screw—it raises the blade, forces the blade up. * * * The dirt lodged at this location next to this screw would force this blade to flex upward, creating a greater gap at this area beyond the screw, * * *. This permitted a greater amount of ink to pass through on both sides of the point where the clogging occurred.
>
> This would change the tonal value. If you were printing a light halftone you would suddenly have too much ink. This would cause streaking in the paper.
>
> * * * * * *
>
> Now, the pre-war machines were designed for a fountain that was underneath the fountain roll, and basically even with the floor and was provided with trash or refuse collection devises, things that would stop large pieces of paper and foreign material from going into the fountain. These devices were usually placed close to the fountain roller to try to enclose this area as much as possible. They did not contact the roller. It was for the foreign material that was inadvertently about the pressroom, broken webs. There was nothing done to keep the paper lint that the motion brought back from clogging the blade. There were efforts made, but they were all efforts that interfered with the uniformity of printing.

There appear to be three sources of foreign materials that can contaminate the ink supply in the fountain: the dust and lint that is on the surface of the web of paper and picked up by the plate cylinder and transferred through the rollers to the fountain; large pieces of paper that result when the rapidly moving web occasionally breaks; and the miscellaneous scraps and dirt around the press room. The 460 patent is intended to protect against these contaminant sources. The large pieces of paper that result when a web breaks and the miscellaneous dirt are provided for:

> * * * the ink fountain comprises a rotably mounted and preferably continuously-driven fountain roller, having its major portion enclosed within a fountain housing so as to minimize the undesirable entry of dirt and trash into the fountain housing. (PX 1)

As to the dust and lint transferred to the fountain from the web by the ink motion, Mr. Davis, plaintiff's expert witness, described the operation of the 460 patent (references are to Figure A):

> This fountain comprises a fountain roller, which is located in this hous-

ing. The housing is closed, as in some of the previous designs that I have tried to speak of, by devices to try to keep trash and newspaper around the pressroom out of the fountain. The mechanism on this side is a regulating screw to adjust the position of a top blade, No. 22, and from the fountain roller and to regulate the thickness of the ink passing from the blade to the ink-taking roll of the ink motion.

THE COURT: The ink-taking roll is 49?

THE WITNESS: 49, yes. That would be one of these spiral pickup rolls they have on the original.

\* \* \* \* \* \*

The invention has a lower blade, 36, which is arranged to hold ink against the face of the roll. The member, 36, along with this one, 42, on the end closes the cavity so the ink is retained in the area. Ink is pumped from a supply with a pump through this pipe to the cavity and retains a uniform level of ink, due to the fact that there are holes at the back end of the cavity, holes through which the ink overflows. The ink is continuously circulated passing through the screen, 62 and 64, and returning to the ink supply where it is re-pumped back to the cavity.

THE COURT: May I interrupt a minute? Is Figure 62 the screen?

THE WITNESS: 62 is one screen and 64 is another screen. Two screens are used, the upper one being a course screen in case there are broken large pieces of foreign material they will not clog up the lower screen. The lower screen is for finer particles.

THE COURT: As I understand you, the pump pumps up into the cavity?

THE WITNESS: It goes up through the pipe, 46, and comes out of the cavity through the hole, 48.

THE COURT: I see.

THE WITNESS: Which happens to be submerged under the body of ink. The advantage of this over the other method of inking where there would be a large body of ink at the bottom—there are a series of advantages, but first as we have the ink in constant circulation compared to the previous systems where you have a fountain, basically at this same place, but you might have had ink say at such a level, the ink in this system has a chance to move basically only in the area close to the roll. The rest of the ink is basically static and the viscosity of the ink is different for various areas in the fountain.

\* \* \* \* \* \*

THE COURT: \* \* \* The roller rotates. As it goes past the cavity it picks up the ink?

THE WITNESS: As it goes past the cavity it picks ink up. The ink is carried from there to the regulating blade. The regulating blade thins the amount that is required at the various lateral positions. That is transmitted to the ink-taking roll where again the ink is split and reduced, the thickness, and it returns some of the foreign material that might be picked up from the ink pickup. As the roll continues to rotate in this direction the blade, 36, wipes the roller and you lose that material from the roller. In wiping the roller it takes the foreign material and lets that also deposit itself down through the screen.

THE COURT: Tell me if I follow you. As the roller rotates it goes beyond the cavity to Figure 49 and on around, and it comes to a point where it reaches a wiper?

THE WITNESS: Yes.

THE COURT: And the wiper cleans the roll?

THE WITNESS: Yes.

THE COURT: And does that ink then fall down?

THE WITNESS: Yes.

THE COURT: To the screen?

THE WITNESS: Yes.

\* \* \* \* \* \*

THE WITNESS: * * * Before I mentioned the need for greater uniformity at points where we apply the ink and regulating the ink to feed to the ink motion. Some of the advances that we have I tried to indicate initially by saying the ink was in circulation, so we had a greater uniformity of viscosity of ink. We also retain the pigment that is in the ink in a better suspension, and better dispersed throughout the ink because of the result of the circulation. In addition to this, we also have a uniform distance from the top level of ink to the regulating blade, so the ink that is carried up to the regulating blade is of a more uniform thickness and it is a uniform thickness all the way across the roller. It is one body of ink all the way across the roller. The volume of the ink that we are working with against the roll is a much smaller body of ink so it is much easier to keep clean.

THE COURT: As I recall, in discussing the prior patent, and particularly with respect to the regulating blade, you indicated that the barrier of material that would get into the fountain would at times narrow the space, reducing the supply of ink to the roll.

THE WITNESS: Yes.

THE COURT: And in other instances it would tend to raise the regulating blade and cause excessive quantity of ink. I think you described the results as one being gray and the other being overly dark.

THE WITNESS: Two conditions.

THE COURT: Do I understand correctly that this design of the regulating blade is entirely free of that kind of interference because it doesn't encounter the foreign substances?

THE WITNESS: That is right.

THE COURT: Go ahead.

THE WITNESS: This ink is a clean supply because the foreign lint and dust is scraped off the bottom and also when the cavity—the shape of the cavity is important. The shape of the cavity is such that as the roll moves upward it forces the ink that is in that small cavity to rotate in a path that I am trying to illustrate. * * * The space is not too great. Rotation in that type of fashion. In one form of the invention there is a small blade. That you inquired about before. It need not be touching the roller.

THE COURT: Which small blade are you talking about?

THE WITNESS: The small wiper blade, yes.

THE COURT: You say it need not be touching the roller?

THE WITNESS: It need not be touching the roller to function properly.

It is spaced close to the roller to gather this lint and foreign material, wiping the foreign material which itself is very similar to what used to occur at this point. Just as foreign material used to clog and form a barrier.

* * * * * *

Q. Mr. Davis, can you just reiterate, very briefly, how the overflow outlet operates to take out the contaminants that may be present in the ink in the cavity.

A. Yes. The ink that has been pumped into this cavity continually overflows through the holes at the back end of the cavity, holes No. 40, and the spill over passing through the screen, returns back to the main supply tank, and is pumped back up into the cavity as filtered clean ink.

This is a large volume of ink. The amount of ink I was speaking about before was residual, laying on this roll, very, very thin, and a very small amount of ink. The contamination is small at any one time. As long as you continually clean it you are in business. If you permit it to accumulate, then you get this condition that clogs.

The essential structures of the 460 patent are a fountain roller substantially

enclosed within a housing; a pair of spaced blades, one above the other cooperating with the surface of the fountain roller to form a cavity, the upper blade being a regulable fountain blade and the lower a wiper blade; a means for continuously supplying an excess of ink to this cavity; an overflow outlet in the cavity through which the excess ink overflows; a screened drain in the bottom of the housing through which the excess ink is filtered and drains; and a means for recirculating this ink together with new ink to the cavity. From the testimony and the evidence, there seems to be little dispute that the 460 patent is intended to provide for the feeding of a uniform and consistent ink film to the rollers of the press unit. It accomplishes this purpose in that it provides for clean ink, free of contaminants, to be applied to the fountain roller, thereby avoiding interference of the fountain blade by debris; and, it provides for a definite fixed exposure of ink to the fountain roll, that does not vary, so that the amount of ink picked up by the roll will be consistent. Ralph W. Becker, a consulting engineer with considerable experience in the printing industry, testified as follows concerning the operation of the Worthington 460 patent:

Q. Mr. Becker, have you at my request studied the 460 Worthington patent?

A. Yes, sir; I have.

Q. From your study of that patent, what is the major point you believe the patent is directing a press designer to do, the main purpose of that patent?

Q. Well, it seems to emphasize clean ink and a control supply of ink to the press inking system, ink motion.

Q. Have you finished your answer?

A. Yes, sir.

Q. From a structural standpoint, what does the 460 patent tell you to do in order to achieve this objective?

A. Well, with respect to the clean ink, it tells me to clean the roller, the fountain roller, before it passes into the fountain cavity area. It tells me to take any foreign material in that ink and filter it back into a tank. And it tells me to keep the fountain roller assembly in a housing about as tight as you can practically make it, so that you can keep trash, and any other dust, dirt and lint out of the fountain roller and fountain area.

As far as the control flow of ink to the press ink motion, it tells me to keep a fixed exposure of fountain ink to the roller, a definite fixed exposure of that ink to the roller. It tells me to have a means of adjusting the thickness of the film of ink that is going to get to the roller.

One other thing it tells me—it tells me to keep an over-supply of ink coming in to the fountain cavity so that I am able to have this fixed exposure of ink to the fountain roller.

THE COURT: You say it teaches you to keep an over-supply of ink in the cavity?

THE WITNESS: Coming to the cavity?

THE COURT: Coming to the cavity, so that you have a sufficient supply for the roller. Does it teach you anything with respect to an excess supply in connection with overflow?

THE WITNESS: Yes, this is what I am saying, sir.

THE COURT: I was wondering.

THE WITNESS: Yes, the supply to the cavity is greater than the requirement of the cavity in its overflow.

THE COURT: What purpose does that serve, in connection with the quality of ink that hits the roller, if any?

THE WITNESS: Not in connection with the quality, no purpose, but it does have a connection with the fine control of the ink to the press ink motion. They want to expose the roller—just a certain portion of this roller, a fixed portion of the roller. And they want to adjust the thickness of the film on the roller.

Emory Worthington, the inventor of the 460 patent, stated on deposition that the basic purpose of the patent is to keep foreign material from getting to the blade:

Q. The essential idea of this 460 patent is to keep foreign material out of the fountain blade or control blade?

A. Absolutely, and I think anyone versed in the art and anyone who knows about such things, as a designer in any company, would quickly identify that situation. (DX 17, pp. 155–156)

## VALIDITY

The initial issue to be determined in this action is the validity of the Worthington patent No. 2,869,460. The applicable statutes are:

35 U.S.C. § 101:

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 102:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

* * * * * *

35 U.S.C. § 103:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in sec-tion 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Section 102 imposes the condition of novelty on the patentability of an invention. In order for an invention to be patentable it must not have been disclosed in the prior art as defined by the statute. Section 103 imposes the requirement of invention in addition to novelty, i. e., the invention need not have been exactly described in the prior art, however, it will not meet the statutory requirement of invention if the differences between the subject matter of the thing sought to be patented and the prior art are such that the subject matter would have been obvious at the time of the invention to a person having ordinary skill in the art to which the subject matter pertains.

It is the position of the defendant that the prior art anticipates the invention in the 460 patent, and that taken as a whole the 460 patent lacks the requirement of nonobviousness. Plaintiff denies anticipation and obviousness and contends that the statutory presumption of validity (35 U.S.C. § 282) has not been overcome by the defendant.

The prior art relied upon by the defendant to invalidate the Worthington 460 patent are United States patents to Smith, 1,262,708 (1918); Smith, 1,338,-044 (1920); Buttner, 1,995,701 (1935); Taylor and Worthington, 2,368,500 (1945); and a prior unpublished drawing and device described as "Press Plan 3". These will be discussed to determine their relevance to the issues of novelty and invention in regard to the Worthington 460 patent.

## THE PRIOR ART PATENTS

U. S. Patent 1,262,708 was issued to E. J. Smith on April 16, 1918, on an application filed June 19, 1916. (D X 2) The witness Ralph W. Becker testified as follows concerning the Smith 708 patent (References are to Figure B):

Q. As the Court has pointed out, Mr. Becker, that slide does include a drawing from the Smith 708 patent, does it not?

A. That is correct.

Q. What kind of structure does that patent show?

A. That's an ink mechanism for a printing press, basically the fountain arrangement.

Q. Does a fountain roller appear in that disclosure; and, if so, would you point it out?

A. Yes. The fountain roller is Item 12, this large circle here.

Q. And how does ink get to that fountain roller in that press design?

A. It is pumped from a reservoir through a line—feed line, up on to some nozzles, which spray the ink onto this fountain roller.

Q. And how does the ink get down to the reservoir, if it does?

A. Excess ink that the roller doesn't pick up drops down through this return line, and any material scraped off of the roller by a scraper blade drops down through this return line and back into the fountain reservoir through a screen, or screen device.

The patent contains eleven claims; claim 11 teaches:

In an inking mechanism, the combination of an inking roller, a plurality of nozzles adjacent to said roller, means for forcing ink through said nozzles upon said roller, means for scraping the surplus ink from said roller, means for carrying said surplus ink away from said roller, and means for rotating said roller at a variable speed for controlling the amount of ink delivered thereby.

There appears to be no disagreement between the parties relative to the operation of the Smith 708 device. Ink is sprayed upon the fountain roller by a series of horizontally arranged nozzles. The roller then comes into contact with the fountain blade which shears off all but a regulable amount of ink which is picked up by the ink motion. Before the roller is again coated with ink it contacts a scraping blade which removes the surplus ink plus any dust or lint that the roller picked up from the ink motion. This surplus ink falls through a drain pipe which brings the ink to a filtering device and returns it to the supply tank where it is recirculated with other ink to be pumped again up to the nozzles.

U. S. Patent 1,338,044 was issued to E. J. Smith on April 27, 1920, upon an application filed on November 29, 1916. Of thirteen claims in the patent, claims 6 and 11 teach the following (see Figure C):

6. In an inking mechanism, the combination of an ink fountain, a fountain roller revolubly mounted therein, a scraper in contact with said roller near its lower-most point and adapted to support a supply of ink between said roller and the walls of the fountain, means for rotating said roller so as to move upward past the scraper the portion of the roller with which said scraper is in contact, means below said scraper straining the ink, means for returning the strained ink to the main body of ink in the fountain, and a second scraper in contact with said roller above said first-named scraper and above the level of the ink in said fountain.

11. In an inking mechanism, the combination of an ink fountain, a fountain roller revolubly mounted therein, a scraper in contact with said roller near its lower-most point at one side of the roller adapted to support a supply of ink between said roller and the walls of the fountain, means for rotating said roller so as to move upward past the scraper the portion of the roller with which said scraper is in

contact, means for straining the ink which leaks between the scraper and the roller and the surplus ink and foreign matter which is scraped from the face of said roller by said scraper, and means for delivering such strained ink to said fountain above said scraper. (DX 2)

In this device, a body of ink is supported in a cavity against the side of the fountain roller formed by a scraping blade and the sides of the fountain. As the roller rotates it picks up a coating of ink from the supply in this cavity and then proceeds to the fountain blade which shears off all but a regulable thickness of ink, which is picked up by the ink motion. The roller rotates to the point where it contacts the lower scraping blade supporting the ink, which scrapes off any remaining ink and any foreign residue on the roller surface. The ink that is scraped off plus any ink that leaks between the ink supporter-scraper blade and the fountain roller falls into a filtering device which cleans the ink and then by means of a pump returns the filtered ink to the supply above the scraping blade.

The expert witnesses of the plaintiff and the defendant, Mr. Davis and Mr. Becker respectively, testified as follows (references are to Figure C):

MR. DAVIS:

Q. * * * Mr. Davis, have you studied this patent, the Smith 044 patent, at my direction?

A. Yes, I have.

Q. Could you please explain the principal objective of this device?

A. Yes. The patent is directed to a method of being able to clean the fountain and to keep the ink that's in the overblade 23 free of foreign material that might be on the roll, the fountain roll itself, to scrape that foreign material free of the roll. And also to be able to clean the fountain, and by moving the roll away from blade 23 when the run is completed, to

let that excess unused ink drain down into the lower tank area 25, where it would be screened again of any foreign material and drained for any future use.

Q. Would you please tell us from your interpretation of this drawing and the specifications of the patent how you believe ink is placed in the fountain?

A. Well, the large cover, that's on the top of the fountain and is pivoted open about the hinge, and ink is poured in by means of a bucket or some similar device.

THE COURT: What do you see before you which indicates that is the only method of feeding?

THE WITNESS: Well, the pump that's in this area can only return ink that's in this lower container back up to the fountain, so it can never retain an amount larger than what is in that container, which is a small quantity of ink. The only ink that enters the container is either the contaminable ink that's scraped off during a normal operation, or the—it is not a supply that keeps on filling. There is nothing shown to show any other method of filling container 25 with ink, so the only place left where we could put ink into that fountain is through that cover.

Q. What happens to ink that's in that fountain as the fountain operates?

A. The level of the ink continually lowers as the ink is consumed.

Q. Why would the level continually lower as the fountain operates?

A. Well, as the press is running, the ink is being used, as if you put a certain level of ink in the fountain, as the press operates, since some ink was consumed, it would continually lower the level. The only ink that's returned to the fountain cavity above blade 23 is the residual ink that came through the fountain and passed through the strainer, and was brought back up to the area blade 23.

MR. BECKER:

Q. Do you find in that slide drawings from the Smith 044 patent; and if so, would you just identify them generally?

\* \* \* \* \* \*

Q. What kind of structure is illustrated by this Smith patent?

A. That is also an ink fountain arrangement for a printing press.

Q. Does that arrangement include a fountain roller; and, if so, would you point it out?

A. Yes, the fountain roller is this large circular shape here.

Q. And how does ink get to that fountain roller in that fountain design?

A. Ink is contained in a reservoir area formed by a lower blade and part of a reservoir compartment and the side of the fountain roller. Ink gets on the roller from this reservoir.

Q. How does ink get to the reservoir; is there some circulation—

A. There is some circulation of the ink in the operation. As to how the reservoir is originally filled—

Q. What is the circulation?

A. There is circulation by scraping off—the bottom scraper blade scrapes off this roller, scraping off any remaining ink on the roller, and foreign materials, which pass down into a sump. This other view shows the screen that it passes through. It drains down into a sump. It is then pumped by this pump and recirculated up through a line and back into the fountain proper.

There is no conflict between the testimony of these two witnesses, but rather each emphasizes a different aspect of the operation of the structure. Mr. Davis speaks only of the method by which the fountain is filled with new ink and the fact that unless it is resupplied from another source the level will run down. Mr. Becker places the emphasis on the recirculation of the contaminated ink back into the reservoir held against the side of the fountain roller. The testimony of either witness would accommodate the other.

U. S. Patent 1,995,701 was issued to H. J. Buttner on March 26, 1935, upon an application filed on April 27, 1932. The patent contains sixteen claims. The drawings of the patented device are set forth in Figure D.

In this fountain, a large trough extends across the width of the press unit. In the upper portion of the trough and near one edge is located another smaller trough. The smaller trough is divided into a number of sections corresponding to page widths of the newspaper to be printed, so that each page width corresponds to a section of the smaller trough. While the press is operating, ink is withdrawn from the larger trough and deposited into the smaller trough by either of two methods: a series of rotating discs which, as they revolve, receive a coating of ink in the larger trough and are then stripped of the ink so as to let it flow into the smaller upper trough; or, a pump which brings ink to the upper trough from the lower. Means are provided with either method to shut off the supply of ink to each section of the upper trough. A fountain roller divided into page widths corresponding to the sections rotates in the upper trough. As it revolves it receives a film of ink which is limited by a scraper blade attached to the edge of the small trough contacting the fountain roller. The roller with this limited quantity of ink rotates to a point where it contacts the fountain blade which allows a regulable amount of ink to remain on the surface to be fed to the ink motion. As was stated, means are provided so that in either of the two methods for supplying ink from the lower to upper trough the flow can be stopped to any individual section that is desired by the press operator. Since the sections correspond to page widths, it follows that ink to any particular page can be cut off and that page "silenced".

The objects of the invention specified in the patent are:

The present invention has for its object the provision of a novel and improved inking mechanism particularly adapted for use in supplying ink to the plate cylinders of high speed rotary newspaper presses. A further object is the provision of an inking mechanism in which the amount of ink subjected to the action of the fountain roller is relatively small thereby reducing the disintegration of the ink. Another object is the provision of a simple and inexpensive inking mechanism with improved means for silencing any page width of the ink fountain. Still another object is the provision of an inking mechanism comprising a relatively few number of parts, all of which are easily accessible. (DX 2)

There is general agreement between the parties as to the intended operation of the Buttner 701 device with the exception of whether or not it teaches "overflow". Defendant's witness, Mr. Becker, testified initially that there is overflow over the back of the smaller trough. The pump or the rotating discs deliver an oversupply of ink to the trough which must overflow. However, on cross-examination, Mr. Becker conceded that the 701 does not specifically teach overflow, but that "it would tempt an engineer to consider it." Pertinent to this issue the patent specifies:

Ink is thus removed from both sides of the disc and flows by gravity into its corresponding section of trough 11 to maintain the trough fully supplied with ink.

\* \* \* \* \* \*

Pump 70 is preferably capacitated to deliver ink at a rate slightly in excess of the maximum requirements of the press, thereby always maintaining a surplus of ink in the smaller fountain trough.

Plaintiff's witness, Mr. Davis, testified that there could be no overflow in the 701 because overflow would defeat the major purpose of the patented structure: to easily silence one page width. He stated that since the sides and back of the trough were the same height, it could not be foreseen on which side ink would flow over, and if it overflowed a side wall, it could spill into an adjoining section where is was desired to have no ink (when that page width was being silenced). According to Mr. Davis, the excess ink that must flow from the upper trough in order to assure adequate supply and yet avoid overspillage would pass by the first blade and then be rejected by the upper regulable fountain blade. Ink rejected by the fountain blade, both experts agree, would be recirculated to the trough. The Davis explanation follows more closely the teachings of the patent than that of Becker, even though the Court agrees with the statement by Mr. Becker that such an operation would require meticulous and precise control such as might make the structure impractical.

U. S. Patent 2,368,500 was issued on January 30, 1945, upon an application filed May 21, 1942. The named inventors are Auburn Taylor and Emory W. Worthington. The patent drawings are attached hereto as Figure E.

This structure is comprised of an ink fountain divided into two chambers by a "baffle plate". In one chamber, a fountain roller is revolubly mounted; positioned near it are a fountain blade and a cut-off blade to regulate the amount of ink passing to the ink motion. Ink pumped from the main supply through a pipe enters this chamber of the fountain and fills it. When the ink level reaches the top of the baffle plate, it overflows into the second chamber, where it drains through another pipe back to the main supply. An adjustable "wier" is affixed to the top of the baffle plate and is used to regulate the level of ink in the main chamber by adjusting the height at which the ink will overflow. Means are provided for introducing a cleansing agent into the

fountain to flood all the parts when a cleansing operation is desired. There is no dispute thus far as to the operation of the Taylor 500 device. The conflict arises concerning the functioning of an optional "refuse collector" (part 40 in the drawing), described in the patent as follows:

> A refuse collector 40 may be affixed to the top of the baffle plate 13 by means of a plurality of screws 41, and this member extends along the width of the fountain cylinder 14 to strain the ink through a plurality of relatively small holes 42 in order to trap scraps of paper and other debris which otherwise would be picked up by the inking mechanism and make its operation imperfect. A cover plate 43 is hinged to the back wall 44 of the ink fountain to protect the ink from dust and dirt as well as to prevent splash and evaporation of the ink in the fountain. (DX 2)

The defendant by its expert witness contends that the refuse collector is a scraper blade in contact with the fountain roll that serves to remove ink and debris, straining the ink through the holes; and also, that it filters ink passing from the first to the second chamber. Plaintiff's expert suggests that the refuse collector does not contact the roller and does not filter the recirculating ink. The refuse collector in his interpretation serves the purpose of preventing any foreign material from entering the fountain when the cover is open. He says that the refuse collector is spaced a distance away from the roller and that the function of the holes in it is "to let the water pass up through and clean it when you are washing it."

Based upon the patent itself and the testimony at the trial the reasonable conclusion is that the refuse collector does serve to scrape ink and foreign material from the fountain roller and it does strain this ink through the holes in it before the ink passes to the fountain proper. The refuse collector, it is concluded, does not filter the recirculating ink as it passes from one chamber to the other. In the patent drawing the refuse collector is shown with a beveled edge in contact with the fountain roller with not the slightest space between them, as, for example, there is between the fountain blade and the roller in this drawing. There is no basis in the patent for Mr. Davis' conclusion that there is a space of approximately one-eighth of an inch between the refuse collector and the roller. The testimony has indicated that fountain blades are generally spaced from five-thousandths to ten-thousandths of an inch from a fountain roller; a space is shown in the drawing between the fountain blade and the roller; it is not, therefore, consistent and not readily acceptable that a space of that minute size would be illustrated in the patent drawing, while a space ten to twenty times larger would not be shown in the same drawing. The beveled edge is further evidence of a scraping function.

The testimony that the holes in the refuse collector merely function to allow water to pass through when cleaning is also unacceptable in the light of the clear specification in the patent " * * * to *strain the ink* through a plurality of relatively small holes in order to trap scraps of paper and other debris. * * *" (emphasis added) Any ink that is being strained must come off the fountain roller. There is no way in which any other ink can get to the topside of the refuse collector without first going through it from the bottom; it, therefore, could not "collect" anything from this other ink because contaminants in it would be forced to remain in the fountain chamber. The Court, therefore, rejects the interpretation of Mr. Becker that the refuse collector filters ink passing from the first chamber to the second. There is a space indicated between the separating baffle and the vertical portion of the refuse collector where ink can overflow without passing through the refuse collector, and as was stated, the refuse collector would not collect any refuse from ink flowing through it from one chamber

to the second, but would simply reject any refuse back into the first chamber, where it would either remain or pass into the second chamber through the space between the baffle and the refuse collector. The refuse collected is that which comes through the fountain opening when the cover is open and that which is strained from the ink being scraped from the fountain roller.

## NOVELTY AND INVENTION

For an invention to be patentable it must possess both novelty and invention. In order to meet the statutory requirement of novelty, the invention must possess statutory newness as defined in 35 U.S.C. § 102. If an invention does not meet the requirements of Section 102, it is anticipated and cannot be valid. "Invention" is not to be confused with novelty and anticipation. A device may possess novelty but lack invention and this be unpatentable by virtue of 35 U.S.C. § 103 which requires that a device to be patentable, although "new", must not have been obvious to one skilled in the art to which it pertains.

> Thus it is incorrect to say that a patent lacks invention because it is anticipated. If it is anticipated it lacks novelty; it lacks invention if it would have been obvious. Monroe Auto Equipment Co. v. Heckethorn Manufacturing & Supply Co., 332 F.2d 406, 414 (6th Cir. 1964).

See also 1 Deller's Walker on Patents, 2d Ed. § 56.

■ The initial issue to be determined is whether the 460 patent has been anticipated in the prior art so as to deprive it of novelty. Novelty will not be negatived by a finding of one part of the patented device in one prior art patent, another part in a second patent, and so forth. Imhaeuser v. Buerk, 101 U.S. 647, 25 L.Ed. 945 (1879). "To anticipate a combination, the combination in its entirety must be old." Bristol v. Otis Elevator Co., 52 F.2d 772, 773 (3rd Cir. 1931). It follows that all of the elements of the invention must be found in a single device in the prior art in order to negative novelty. There must be identity or substantial similarity between the prior device and the patentee's invention. Connecticut Valley Enterprises, Inc. v. United States, 348 F.2d 949, 172 Ct.Cl. 468 (1965).

The elements of the 460 patent combination are: (1) a fountain roller mounted and driven within a housing substantially enclosing the major portion of the roller surface; (2) a fountain blade extending longitudinally along one side of the fountain roller; (3) a second wiping blade positioned below the fountain blade forming a cavity with the fountain roller and the sides of the fountain and also serving to wipe dirt from the surface of the roller; (4) means for supplying ink to the cavity in excess of the requirements of the press, maintaining a fixed exposure of ink to the fountain roll, and means for overflowing the excess ink from the cavity; (5) means for straining the overflow ink and for recirculating it as part of the ink supplied to the cavity. Each of these elements can be found somewhere in the prior art patents. The Taylor 500 has a fountain roller substantially enclosed within a housing. All of the prior art patents have a fountain blade extending along one side of the fountain roller. A wiping blade is present in the Smith 708, the Smith 044, and the Taylor 500. A wiping blade forming a cavity with the fountain roller supporting a body of ink against the fountain roller is present in the Smith 044. An oversupply of ink in excess of the press requirements is found in Smith 708, Buttner 701, and Taylor 500. A fixed exposure of ink against the fountain roll is present in Buttner 701 and in Taylor 500. Straining of the overflow ink can be found in Smith 044 and Smith 708. Recirculation of overflow ink is present in Buttner 701, Taylor 500, Smith 708, and to some extent in Smith 044. Although each of the elements of the 460 can be found in

the prior art patents, no single one of them contains all the elements in combination. No prior art patent is identical or substantially similar to the 460 patent and hence does not meet an essential requirement for anticipation. The 460 patent has not been anticipated in the prior art and meets the requirements of novelty imposed by 35 U.S.C. § 102.

■ The next consideration is the requirement of "invention" set forth in 35 U.S.C. § 103. Obviousness unlike anticipation can be shown by combining elements of several prior art patents; it is not necessary to find all of the elements in one prior patent. Sperti Products, Inc. v. Coca Cola Co., 399 F.2d 607 (3rd Cir. 1968); Gould-National Batteries, Inc. v. Gulton Industries, Inc., 361 F.2d 912 (3rd Cir. 1966). The Court in *Sperti Products* citing *Gould-National* held:

> * * * a "claim * * * comprised of an aggregation of elements which the court below found were old and well known in the art * * * is invalid for its failure to meet the test of § 103." 399 F.2d 607, 609.

■ Identity of invention is not the test, but rather what one having ordinary skill in the art could have done. In Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) the Supreme Court observed:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. 383 U.S. 1, 17, 86 S.Ct. 684, 694.

■ As was previously shown, all of the elements of the combination in the Worthington 460 are "old." The critical question is whether combining the old elements in the same manner as in the patentee's device would have been obvious to one skilled in the art. The fact that all of the elements of the combination are old is not determinative.

Unquestionably, invention may be present if an element or elements priorly known are combined in such a way with other elements, either new or old, so as to produce an entirely new and useful result or function. The invention, in such circumstances, rests in the novel result produced by the combination,—a result which is entirely separate and distinct from the service performed by any or all of the elements or by a mere aggregation of them. In Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 318, 29 S.Ct. 495, 500, 53 L.Ed. 805, where the Supreme Court defined a combination as a "union of elements, which may be partly old and partly new, or wholly old or wholly new", the court then said "But whether new or old, the combination is a means— an invention—distinct from them [the elements]." Griscom-Russell Co. v. Westinghouse Electric & Mfg. Co., 121 F.2d 680, 682 (3rd Cir. 1941).

The Smith 044 patent contains a lower wiping blade which supports a body of ink against the side of the fountain roller and which also serves to wipe the fountain roller clean on each revolution; the contaminated ink wiped off, is strained and then recirculated. Based upon the testimony of both the plaintiff's and the defendant's expert witnesses, it is concluded that this device supports a body of ink, cleans the fountain roller, and prevents contaminants from entering the clean supply of ink above the cleaning blade by using substantially the same structures to perform substantially the same function as the 460 patent. The patent objects themselves are further evidence of this.

WORTHINGTON 460:

> A further object is the provision * * * for cleaning the surface of the fountain roller at each revolution thereof, and for removing the larger particles of dirt and trash from the ink

within the fountain housing. * * * (PX 1)

SMITH 044:

Another object of my invention is to provide a means for scraping the surface of the fountain roller and removing therefrom the paper dust and other foreign substances which gather thereon, and for preventing such foreign matter from coming in contact with the major portion of the ink in the fountain. (DX 2)

The Smith 708 patent also provides for straining contaminated ink that has been scraped from the surface of the fountain roller, and then recirculating it to be used again.

The Buttner 701 and the Taylor 500 both provide for maintaining a fixed exposure of ink to the fountain roller, so that the roller picks up and in turn feeds a uniform quantity of ink to the ink motion. In both devices this is accomplished by providing a type of overflow of ink and recirculation. In the 460 patent, the same operation (recirculation and overflow) performs the same function (fixed exposure of ink) to obtain the same result (uniform wetting of the fountain roller). The evidence overwhelmingly supports such a conclusion. The functioning of the Buttner 701 and the Taylor 500 as described above is well documented by the patents themselves and the testimony at trial, as is the functioning of the 460, notwithstanding plaintiff's contention that the overflow and recirculation in the 460 patent achieve a different purpose, i. e., providing a small volume of ink at the side of the fountain roller in connection with a pump which provides a substantial excess of ink to the cavity so that the small volume is kept in continuous motion and is constantly being changed so as to dilute and flush out foreign material which might otherwise impair the functioning of the fountain. Such an operation is not described in the claims or the specifications of the 460 patent, nor does it appear necessary to the proper func-

tioning of the device described in the patent. Defendant's expert, Mr. Becker, could find no evidence to support such an operation and neither can I. The contaminant problem is provided for in the patent by the use of the scraper blade. Furthermore, once it is established that overflow and recirculation provide for a fixed exposure of ink to the fountain roller, merely making the exposure smaller and necessarily the overflow greater does not require inventive skill, especially in light of the fact that no such operation is described in the patent, but instead described as the probable functioning by an expert.

The Taylor 500 patent provides for substantially enclosing the fountain roller within a housing to prevent contaminants from getting on it, achieving the same result as in the 460 by the same means.

It is concluded that all of the goals sought to be achieved in combination by the 460 patent have been accomplished separately in the prior art, and it is further concluded that combining such devices would have been obvious to one skilled in the art. A combination of old elements to be patentable must produce "an entirely new and useful result or function." Griscom-Russell Co. v. Westinghouse Electric & Mfg. Co., 121 F.2d 680, 682 (3rd Cir. 1941). In that case the Court held:

Price combined nothing. By mechanical adaptation, he was able to aggregate two old elements and thus use both. Together (i. e. in combination) these elements performed no new function. 121 F.2d 680, 682.

■ Likewise, Worthington's "invention" performed no new function. All of the functions and results of the 460 had been obtained before by the same operations in different devices and all Worthington did was combine them in one device. He was mechanically able to aggregate old elements in order to use them together in one device. Together they did not perform any new function.

Such a device is not patentable; nothing has been invented. Rather, something has been fabricated, with such skill as one skilled in the art possesses. It is recognized that the fact that all the elements are old does not necessarily militate against patentability, Frank W. Egan & Co. v. Modern Plastic Machinery Corp., 387 F.2d 319 (3rd Cir. 1967), but a device which combines several old elements to produce nothing new but instead takes advantage of all together as was done here does not require invention but merely mechanical ability. In view of the prior art, a person with ordinary skill in the art could have arrived at such a construction as the 460 device, because all of the functional elements were old, and more importantly putting them together to perform no new function did not require inventive skill. Patentability requires "a new and useful result which called for more than the ingenuity of a mechanic skilled in the art." Fisch v. Gould, 246 F.2d 5, 7–8 (3rd Cir. 1957).

Plaintiff urges that "taken as a whole" the 460 invention is not obvious, however, the "whole" must give something new, not merely aggregate the old to be patentable. What the "whole" achieves in the 460 is clean ink under the fountain blade and uniform wetting of the roller. These are not new results; they had been achieved before separately.

> The result must be the combination and not a mere aggregation of several results, each the complete product of one of the combined elements. It must be the product of the coacting influences of the various elements and which is produced by their union. * * * A number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them is not patentable invention. Huntman Stabilizer Corp. v. General Motors Corp., 144 F.2d 963, 965 (3rd Cir. 1944) cert. den. 323 U.S. 782, 65 S.Ct. 271, 89 L.Ed. 624.

It is concluded that the elements of the 460 combination perform no new function; instead each achieves the same result that it accomplished independently, together with the others. The result is not in the combination but is the mere aggregation of several results each the product of one of the elements which the court speaks of in the *Huntman* case. Worthington Patent No. 2,869,460 is invalid. 35 U.S.C. § 103.

The Supreme Court has indicated that there may be secondary considerations pertaining to the requirement of non-obviousness:

> Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 694 (1966).

There is no necessity to discuss secondary considerations in this case because the 460 has been found to be obvious directly from the prior art. However, since the parties seem to place a large degree of importance to such considerations, they will be briefly discussed.

Plaintiff has introduced no evidence of commercial success of the 460 patent. In October, 1958, Worthington entered into an agreement with the "New York Daily News" whereby the News would build an ink fountain in accordance with the 460 patent and install it on one of its presses. If the fountain worked, policy toward it would be determined later and the News would offer it to anyone who wanted to purchase a license. The fountain was constructed using drawings supplied by Worthington and made by Mr. Davis, plaintiff's expert witness at the trial. It was put into operation at the News in September 1959. The fountain was operated for about one year under what plaintiff characterizes as "edition conditions", and defendant

calls a "test". The fountain was never again used by the News. Since plaintiff has introduced no evidence that the test at the News was successful, which would be available if it had been, the conclusion reached on the basis of the facts adduced are that the test was unsuccessful and the 460 fountain was never used again anywhere. Only one license of the 460 patent was given by Worthington, and this is a royalty-free grant to the Wood Newspaper Machinery Corp., in conjunction with another patent for which royalties would be paid. (DX 47) No evidence was introduced as to whether or not Wood ever built a 460 device under the license.

Plaintiff's contention that the Worthington invention produced a major advance in the newspaper ink fountain art is not supported by the affirmative evidence concerning its success. The position that the success of the accused device—the Goss "Flo-Matic"—is evidence of the success of the 460, both begs the question of infringement and makes the unsupported assumption that the Flo-Matic's success is due to its allegedly infringing features rather than its non-infringing features—quick color changes. Mr. Becker testified at trial that in his opinion the 460 was impractical for a modern newspaper press precisely because it does not provide for quick color changes.

No evidence of "long felt but unsolved needs" or "failure of others" has been found in this record, nor have any other relevant secondary considerations that would tend in any degree to indicate that the 460 patent was not obvious.

Accordingly, the finding that the patent in suit is obvious in light of the teachings of the prior art patents is not affected to any extent by the secondary considerations. If anything these considerations support a finding of obviousness.

■ Every patent possesses a statutory presumption of validity, and the burden of establishing invalidity rests upon the party asserting it. 35 U.S.C. § 282. But it has been held that "[w]here the patent office has not considered important portions of the prior art, the presumption of validity arising under 35 U.S.C. § 282 from the issuance of the patent is weakened." Dole Refrigerating Co. v. Amerio Contact Plate Freezers, Inc., 265 F.2d 627, 629 (3rd Cir. 1959). See also Scripto, Inc. v. Ferber Corporation, 267 F.2d 308 (3rd Cir. 1959). The patents issued to Smith, 1,262,708, Buttner, 1,995,701, and Taylor, et al, 2,368,-500 are not cited as references and were not considered by the patent office in granting the 460 patent (DX 1, PX 1). The facts concerning the Smith 1,338,-044 are more complicated. This patent is cited as a reference by the 460 patent, but the following facts have been disclosed:

The 460 application was filed February 27, 1957, and about the same time offered to Goss by Worthington (PX 15, Report No. 1). Goss replied calling Worthington's attention to the Smith 044 and Taylor 500, stating its belief that because of these two prior patents the Worthington device was unpatentable (PX 18). Worthington's response was that he was familiar with the patents cited by Goss (DX 15). The patent office's first action indicated all claims to be allowable, with the exception of certain typographical errors, citing as the only reference "Kaddeland 2,177,656." (DX 1, p. 19.) In July, 1958, Worthington's attorney wrote the patent office and cited *Smith 2,018,193* as a reference. (DX 1, p. 20). The examiner made this patent a file reference and held "PROSECUTION ON THE MERITS CLOSED" in August, 1958 (DX 1, p. 22). In October, 1958, before the final fee was paid, Worthington, by his attorney, called the Smith 044 patent to the attention of the patent examiner. (DX 1, p. 25.) The amendment was allowed and the final fee paid within one month. (DX 1, pp. 33–34.)

These facts indicate that although the Smith 044 patent is a file reference in

the 460 patent, it was not duly considered by the patent office, but merely added as a reference after final allowance of the claims in the patent; prosecution on the merits was not reopened to consider the Smith 044 patent. Furthermore, the finding here that the 460 would be obvious uses the Smith 044 in conjunction with three other prior art patents, none of which were considered by the examiner. This Court may, therefore, review the patent issued by the patent examiner and arrive at the conclusion that it should not have been allowed; "respect for * * * considered administrative decision does not justify abdication of the normal judicial function." Alco Kar Kurb, Inc. v. Ager, 286 F.2d 931, 933 (3rd Cir. 1961). In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950) the Supreme Court observed:

> Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee had added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly. 340 U.S. 147, 152–153, 71 S.Ct. 127, 130.

Accordingly, the statutory presumption of validity has been overcome.

## PRESS PLAN NO. 3

Since there has been a finding that the 460 patent is invalid because it is made obvious by the prior art patents, it is not really necessary to delve into what the parties have labeled "THE PRESS PLAN #3 DEFENSE." However, since this issue received considerable attention in the trial testimony and in the briefs and arguments of both parties, a brief discussion of it would seem to be in order.

Emory Worthington, the plaintiff in this action, and the inventor of the allegedly infringed patent was employed by the Goss Company, the manufacturer of the accused structure, from 1934 continuously to 1946. During that time he was put in charge of the development of what came to be known as Press Plan 3, which, among other things, includes a design for a newspaper press inking fountain. DX 5 introduced into evidence at the trial consists of an envelope on which is marked "Press Plan No. 3 General Description of Proposed Goss Rigiframe Press 12/14/43". Inside is a booklet entitled "GOSS PRINTING PRESS CO. CHICAGO, ILL. PROPOSED DESIGNS FOR HIGH SPEED NEWSPAPER PRESS". The booklet consists of fourteen pages of engineering drawings, three typewritten pages of description, and one page of freehand drawing. The fourth page of the engineering drawings contains a detailed drawing of the proposed Press Plan 3 fountain, and page 2 of the accompanying written description provides the only written reference to the fountain:

> No. 9 There is an improved system of ink supply, providing clean ink under the fountain blade, at all times.

When Worthington left the employ of Goss in 1946 he took with him a copy of the Press Plan 3 fountain drawing (DX 13), but no other written descriptive material concerning it. He kept this drawing in his files until the inception of this litigation.

The initial consideration pertaining to the Press Plan 3 fountain structure is whether it is a part of the body of prior art that may be used to either anticipate

or render obvious the 460 patent. The limits of prior art are proscribed by 35 U.S.C. § 102. There is no dispute that the Press Plan #3 fountain was not patented or described in a printed publication in this or a foreign country, and that it was not in public use or on sale in this country more than one year prior to the date of the application for the 460 patent. The only remaining consideration therefore, is whether "the invention was known or used by others in this country, * * * before the invention thereof by the applicant for patent, * * *." (Sec. 102(a)).

■ The term "known or used by others" has been interpreted to mean "publicly known * * *." Jones Knitting Corporation v. Morgan, 361 F.2d 451 (3rd Cir. 1966). Application of Borst, 345 F.2d 851 (C.C.P.A.1965). Connecticut Valley Enterprises Inc. v. United States, 348 F.2d 949, 172 Ct.Cl. 468 (1965).

The district court concluded that the Morgan Patent was anticipated in the prior art primarily on the basis of a fabric claimed to have been made by Carroll Anderson in 1933. But assuming similarity, more is required to constitute prior art under the statute. The Reviser's Notes to Section 102, 35 U.S.C.A., make clear that the interpretation of "known" by the courts assimilated it to "publicly known". Jones Knitting Corp. v. Morgan, supra, 361 F.2d 455.

■ Assuming that there is sufficient identity between the Press Plan 3 fountain and the 460 to anticipate the 460 patent, it nevertheless remains necessary for defendant to prove that there was public knowledge of Press Plan 3 prior to Worthington's invention of the 460.

Defendant's contention is as follows: On this record, Press Plan 3 was known to Tellfors, Heitz and Nolan in 1944; and it was studied by Tyma and Knowles prior to their seeing the 460

design. This alone makes the Press Plan 3 fountain prior art. (DB 3)

Defendant has presented no evidence that the Press Plan 3 fountain was known to anyone outside of the Goss Plant. All of the persons with knowledge of Press Plan 3 were Goss employees. Although it is recognized that there does not necessarily have to be a showing of actual public knowledge, Rosaire v. Baroid Sales Division, 218 F.2d 72 (5th Cir. 1955), the knowledge relied upon must be accessible to the public. Connecticut Valley Enterprises, Inc. v. United States, supra. The Press Plan 3 drawings were in the files of the Goss Company and never available to the public. The alleged "reduction to practice" of the Press Plan 3 fountain that defendant attempts to prove through the deposition testimony of Tellfors (DX 21b), Heitz (DX 21c), and Nolan (DX 20d) is insufficient to prove that the use of the Press Plan 3 experimental fountain was done in the ordinary course of business of the Goss Company, which has been held to be sufficient to constitute public knowledge. See Corona Cord Tire Company v. Dovan, 276 U.S. 358, 48 S.Ct. 380, 72 L. Ed. 610 (1928). A portion of the deposition testimony of William Nolan is illustrative:

Q. I take this confusion of whether something was discussed at various meetings is because to your mind this fountain that you saw and Press Plan 3 are the same thing?

A. Well, what I heard talked about was Press Plan 3.

Q. But you thought this was a Press Plan 3 experimental fountain?

A. That's what I thought it was.

 * * * * * *

Q. Well, what caused you to think this was a Press Plan experimental fountain? Did somebody tell you that?

A. Well, I don't remember where I heard, but I would assume at the time that it would be the Press Plan 3.

Q. This was just an assumption that you made, is that correct?

A. Sure. (DX 20D, 107–108)

The deposition testimony is not conclusive as to exactly what was built, under what circumstances it was built and the accessibility to it. This is, of course, understandable in light of the fact that it pertains to events occurring over 20 years before, and only the memory of the deponents is relied upon.

The inter-office correspondence of Goss (DX 8) is likewise inconclusive as to what was actually built.

 Defendant has failed to meet the burden of proof necessary to establish public knowledge of Press Plan 3. There is clearly a reasonable doubt, and, therefore, this defense will fall. Jones Knitting Corporation v. Morgan, *supra*. Press Plan 3 has not been considered as prior art in order to invalidate the 460 patent.

 The second consideration concerning Press Plan 3 is that assuming it is the same device as the 460, it was invented by Worthington "and others" while in the employ of Goss, and Goss, therefore, contends that it has a right to it and can use it freely. Worthington claims that if Goss possessed any right to the 460, it lost these rights to Worthington by way of adverse possession when it did not claim any rights within the statutory period. Neither defendant nor Goss claim a property right in the 460, but rather that Goss can freely use any features found in Press Plan 3. The question of adverse possession and estoppel that plaintiff raises are no longer an issue since the 460 has been found to be invalid. The same result holds as to whether Goss can freely use Press Plan 3. There are no patent rights standing in the way of Goss' free use of Press Plan 3.

## INFRINGEMENT

The finding of invalidity disposes of this litigation. Nevertheless, it has been felt to be preferable for the district court to make findings on the issue of infringement so that, in the event of reversal on validity, a remand for determination of the issue of infringement will not be necessary. See Frank W. Egan & Company v. Modern Plastic Machinery Corp., 387 F.2d 319 (3rd Cir. 1968).

 Infringement is the unauthorized making, use or sale of any patented invention within the United States during the term of the patent. 35 U.S.C. § 271. What is infringed are the claims of the patent which measure and define the invention.

In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

Defendant is charged with infringing the 460 patent by the use of several Goss "Flo-Matic Fountains" in its printing press units. There are two Flo-Matic fountains respectively labeled "Flo-Matic I" and "Flo-Matic II". There is only one difference between the two structures. In the Flo-Matic I the lower blade had attached to it a strip of spring steel which contacted the fountain roll (PX 11). In the Flo-Matic II this strip was removed and the lower blade was spaced at a small distance away from the fountain roller (PX 46). The Flo-Matic I structures were used by defendant from about August 1964 until January 1965 when they were converted to the Flo-Matic II.

The 460 patent contains eight claims (PX 1). Plaintiff contends that the Flo-Matic I infringes claims 1, 3, 4, 5, 6 and 7, and that the Flo-Matic II infringes claims 3, 5 and 7.

When analyzed, it appears that infringement centers about two elements of the Flo-Matic fountains: housing for the

fountain roller and the wiping function of the lower blade on which the ink is carried.

Defendant denies that a "fountain roller substantially enclosed within a housing" and a "lower wiping blade" as taught in the allegedly infringed claims, can be found in the accused Flo-Matics; it admits that all of the other elements of the claims are in the Flo-Matics. The issue presented is whether in fact the accused fountains include both fountain rollers substantially enclosed within a housing and a lower wiping blade, in the same sense as in the 460. If they do, then there is infringement. If they do not, then the question is whether their omission serves to remove the structures from an infringing status.

■ The 460 is a combination patent. Each of the alleged infringed claims states: "A rotary letterpress ink fountain including *in combination.* * * *" (Emphasis added.) "Combination patents are patents in which the claimed invention resides in a specific combination or arrangement of elements, rather than in the elements themselves." Kinnear-Weed Corp. v. Humble Oil & Refining Co., 150 F.Supp. 143, 162 (E.D.Tex. 1956). The entire combination of elements acting upon each other produce the patentable device; the combination patent covers the totality of the elements in the claim and no one element separately.

It has been held that the omission of a claimed element of a patent in an allegedly infringing device where there is no substituted equivalent for the missing element avoids infringment. Gardiner et al. v. Freed Heater & Mfg. Co., 107 F.2d 364 (3rd Cir. 1939). In Etten v. Kauffman, 121 F.2d 137 (3rd Cir. 1941), Judge Jones, speaking for the court said:

In a combination patent every element claimed is deemed to be material to such an extent that evidence to the contrary is not admissible. * * * (citing cases). * * * "The end in

view [i. e., of the patent] is proposed to be accomplished by the union of all, arranged and combined together in the manner described. * * * The use of any two of these parts only, or of two combined with a third, which is substantially different, in form, or in the manner of its arrangement and connection with the others, is, therefore, not the thing patented. It is not the same combination, if it substantially differs from it in any of its parts." * * * The rule has been restated a number of times and always to the same effect except for the qualification that the addition of an equivalent for the omitted element will not avoid infringement if the equivalent comes within the range of those allowable to the original patentee. * * * Here, the combination claimed by Schuda forms an entity, and in the Etten structure, as the court below correctly found, one of the important elements claimed by Schuda is omitted. 121 F. 2d 137, 139–140.

The fountain roller in the Flo-Matic fountain (Fig. F) is not enclosed within the fountain housing at all, so there is no question of degree of what "substantial" means. The fountain housing is well below the fountain roller. Plaintiff contends by his expert witness, Mr. Davis, that the "mist guards" in the press unit using the Flo-Matic is the element which substantially encloses the fountain roller, and that these mist guards correspond to the fountain housing in the 460. Whether or not this is in fact the situation is the determinative question. Upon cross-examination, the following testimony was elicited from Mr. Davis:

Q. If you put one of Mr. Worthington's fountains in a modern press would there be a mist guard there?

A. I don't know. The patent doesn't mention mist guards and the reference patent to which it refers, too, as showing this invention, as showing the preferred embodiment, does not show mist guards.

Q. But from your knowledge of modern design that would have to be?

A. A modern press, such as the Mark I, would have mist guards.

\* \* \* \* \* \*

Q. Will you agree with me that the fountain roller in Mr. Worthington's patent, \* \* \* is enclosed in a different sense than the fountain roller in the Flo-Matic is enclosed?

A. Would you repeat that?

Q. Yes. I take it that you agree that the 460 patent is enclosed, whether or not mist guards are provided?

A. Yes.

Q. Whereas in the Flo-Matic fountain you have to rely upon the mist guards to find an enclosure, do you not?

A. Yes.

Q. So the 460 patent had a fountain that was enclosed in a different sense than the Flo-Matic?

A. The 460 patent is enclosed in a form—the history of development, as I tried to illustrate, was the mist guards were commonly employed.

Q. They were commonly employed in 1956, were they not?

A. Yes. \* \* \*

\* \* \* \* \* \*

THE COURT: Let me ask you this, Mr. Davis.

MR. DAVIS: Yes.

THE COURT: You distinguished between mist guards and plates over the top. What is the function of the mist guard, the primary function?

THE WITNESS: This gets a little bit historical. As we increase the ink we have to try to enclose that to keep the mist from spreading out into the pressroom and cover the plate on both sides of the inking unit, the ink motion.

THE COURT: Does the mist guard also serve another purpose besides preventing the spreading of the mist?

THE WITNESS: Yes. It performs several functions. One function is a safeguard for the personnel and keeps them from becoming entangled in the rollers. It stops foreign material that might be in the pressroom from becoming entangled. If trash paper got caught in the rollers it could be sucked in. It also provides the function of housing.

\* \* \* \* \* \*

Q. The Court asked you about these mist guards. Isn't there really a considerable amount of mist and ink developed inside those mist guards on a modern high speed press?

A. It depends whether they are equipped with static charge devices to minimize the mist.

Q. In fact these presses have so much mist that you have to take some way of handling the mist, like an electrostatic device, isn't that right?

THE COURT: Is that the kind of a device where you have an electrically charged field which draws the mist in?

THE WITNESS: The charge draws the mist back to the roll.

\* \* \* \* \* \*

Q. If such a device is not provided and the mist settles on the sides of the mist guards and other parts inside the press it drains down and finally ends up in the fountain?

A. Yes.

Q. \* \* \* In Mr. Worthington's 460 patent is ink not drawn down; the mist coalesces and the ink couldn't get into the fountain, could it?

A. No.

Q. In fact, that ink drains down into the fountain?

A. When you say "drains down"?

Q. Yes.

A. The wording sounds like you have a real flow.

Q. If you don't have static precipitators I am suggesting you do have a flow, a considerable amount of mist which drains down, coalesces on the parts?

A. Not any more than drains down the pressroom wall. A wet wall—completely covers it. It's not running as if you had a leak in the ceiling for example.

Q. Mr. Davis, the point of the mist guard is to keep that mist away from the pressroom wall?

A. Without a static electric charge device it doesn't do it.

Q. I am postulating the press without a static charge. That ink will settle in the mist and drain down the wall —in the 460 patent that ink cannot get into the fountain; isn't that right?

A. Yes.

Q. It is going to eventually end downstairs in the basement; isn't that right?

A. There is not that much of a flow.

Q. Whatever flow.

A. There is not that much accumulation. Normal housekeeping prevents that.

Q. Whatever flow there is is going to end up in the basement; isn't that right?

A. I wouldn't agree with that.

Q. You see that in the Flo-Matic, if it flows down the mist guard, it is going to end up in the fountain, isn't that right, the sump?

A. Yes.

■ The purpose of the mist guards is to keep mist from getting out, and to keep anything from interfering with the operation of the ink motion enclosed within the guards, including dirt and trash. It is concluded that the mist guards are not the same structure, and do not serve the same purpose as the fountain housing in the 460 patent. Mr. Davis virtually admitted that a press using the 460 would also have mist guards in addition to the housing substantially enclosing the roller surface. The mist guards in such an arrangement would serve the same purpose as they do in the Flo-Matic. In effect Mr.

Davis is saying that if mist guards were used in a 460 press, then there would be no necessity for enclosing the roller in the fountain housing. This is an inescapable conclusion based on the testimony; if the mist guards will fulfill all of the functions in the Flo-Matic as the fountain roller enclosing housing in the 460, then mist guards necessarily must be capable of performing the same function in the 460, and the "substantial enclosure" element of the patent claims will be superfluous. There is no indication whatsoever that this element of the patent would be used only if mist guards were not employed, and mist guards were common in 1956, the date of invention. Plaintiff, by indirection is seeking to accomplish what he cannot do directly—he is trying to make an element of the patented combination unnecessary in order to make out a case of infringement. Every element of the claimed combination is necessary and must be in the accused device before there can be infringement. Etten v. Kauffman, *supra*.

■ The doctrine of "equivalents" is not applicable in this case. A patentee may invoke that doctrine "to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.'" Graver Tank & Mfg. Co. v. Linde Air Products Co., *supra*, 339 U.S. 608, 70 S.Ct. 856. The mist guards are not an "equivalent" of the fountain housing. They are principally used for an entirely different purpose, and would probably be included with the patented device together with the disputed element. The fact that the guards will also keep debris in the pressroom out of the fountain in the Flo-Matic is irrelevant; they will accomplish the same purpose when used in the 460. This would at first glance seem to make the substantially enclosed fountain roller in the 460 superfluous when mist guards are used, and this would be true if not for the fact that the 460 is aimed at keeping foreign material from the foun-

tain blade, and the roller housing will help accomplish this even if there are mist guards. There is debris *inside* the mist guards that the mist guards obviously cannot keep out of the fountain; in the 460 the fountain housing will keep it out, while in the Flo-Matic, it will just fall into the fountain. The Flo-Matic is directed to quick color changes so it is not so concerned with dirt in the fountain. The mist guards are not an equivalent device. Under the doctrine of equivalents as defined by the Supreme Court in the *Graver* case, the "same result" must be obtained by the equivalent elements. The result of the 460 combination (clean ink under the fountain blade) is not the same as the result achieved by the Flo-Matic (quick color changes).

 The claims of the patent precisely mark its boundaries, and they will not be expanded to include "a fountain that does not have a fountain roller substantially enclosed within the housing in which it is mounted if mist guards are used." Mist guards are another part of the press unit that the evidence discloses are not a part of the fountain, but optional equipment. Worthington, with his experience in the industry, was aware of mist guards when he "invented" the 460, but does not speak of them in the patent. The reason is obvious; they are not relevant to the patented structure, and whether mist guards are used or not, all the elements of the claims are necessary to perform the function patented. The claims of the 460 patent should not be expanded to include a combination that does not include all of the parts deemed essential by the patent. The patent grant of monopoly should be strictly construed, so that only that which is precisely claimed is forbidden to public use.

Great A & P Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). See also the dissenting opinion of Justice Black in Graver Tank & Mfg. Co. v. Linde Air Products Co., *supra*. A patent which is not a "pioneer patent" but a combination of elements, all of which are old, should be properly limited to the precise elements therein. Etten v. Kauffman, *supra*. See Computing Scale Company of America v. Automatic Scale Company, 204 U.S. 609, 27 S.Ct. 307, 51 L.Ed. 645 (1907).

 Accordingly, it is concluded that none of the claims of the 460 patent have been infringed by either Flo-Matic fountain, because the accused devices do not include a "fountain roller driven and rotably mounted within a housing which *substantially encloses the major part of the roller surface.*" The omission of this element of the combination avoids infringement. Furthermore, there is no fraud on the patent by slightly deviating from the exact language of the claims, which the Court speaks of in *Graver*, because the purposes of the 460 and the Flo-Matic are entirely different.

Since infringement has been avoided by the omission of the enclosed fountain roller, it is not necessary to evaluate the significance of the wiping function of the lower blade. Whether the Flo-Matic blade is or is not the same as the claimed element, neither of the accused fountains infringe the Worthington Patent No. 2,-869,460.

An appropriate order consistent herewith for entry of judgment in favor of defendant and against plaintiff with prejudice and without costs will be submitted.

See Appendix on next page.

APPENDIX

FIGURE A

Jan. 20, 1959 E. W. WORTHINGTON 2,869,460

ROTARY LETTERPRESS INK FOUNTAIN

Filed Feb. 27, 1957

*Fig. 1*

[A3700]

FIGURE B

E. J. SMITH.
INKING MECHANISM.
APPLICATION FILED JUNE 19, 1916.

1,262,708.

Patented Apr. 16, 1918.

Fig. 2.

Fig. 1.

Witness
Milton Lenoir

Inventor.
Ernest James Smith
By
Adams & Jackson
Attorney

[A3701]

FIGURE C

E. J. SMITH.
INKING MECHANISM.
APPLICATION FILED NOV. 29, 1916.

1,338,044.

Patented Apr. 27, 1920.

2 SHEETS—SHEET 1.

Fig 1.

Witness,
L. B. Graham

Inventor;
Ernest James Smith
By Adams & Jackson
Attys.

[A3702]

FIGURE D

March 26, 1935.　　　H. J. BUTTNER　　　1,995,701

INKING MECHANISM

Filed April 27, 1932　　2 Sheets-Sheet 1

*Fig:1.*

*Fig:5.*　　*Fig:6.*

INVENTOR

*H. J. Buttner*

BY *John D Morgan*

ATTORNEY

[A3703]

March 26, 1935. H. J. BUTTNER 1,995,701

INKING MECHANISM

Filed April 27, 1932 2 Sheets—Sheet 2

*Fig:2.*

*Fig:3.*

*Fig:4.*

INVENTOR
*H. J. Buttner*
BY
*John D. Morgan*
ATTORNEY

[A3704]

FIGURE E

Jan. 30, 1945. A. TAYLOR ET AL 2,368,500

PRINTING PRESS INKING MEANS AND MECHANISM

Filed May 21, 1942 2 Sheets—Sheet 1

Fig. 1

INVENTORS
AUBURN TAYLOR
E. W. WORTHINGTON
BY
ATTORNEY

[A3705]

Jan. 30, 1945. A. TAYLOR ET AL 2,368,500

PRINTING PRESS INKING MEANS AND MECHANISM

Filed May 21, 1942 2 Sheets—Sheet 2

INVENTORS
*AUBURN TAYLOR*
*E. W. WORTHINGTON*
BY
*ATTORNEY*

[A3706]

## FIGURE F

FLOMATIC

[A3707]